Rockingham
No. 91-239

THE STATE OF NEW HAMPSHIRE

v.

PAMELA SMART

February 26, 1993

*John P. Arnold*, attorney general (*Paul A. Maggiotto*, assistant attorney general, on the brief and orally), for the State.

*Johnson, Mee & May*, of Boston, Massachusetts (*J. Albert Johnson & a.* on the brief, and *Mr. Johnson* orally), for the defendant.

BATCHELDER, J. The defendant, Pamela Smart, upon entering her Derry home on the night of May 1, 1990, observed the body of her husband, apparently the victim of a homicide. The police arrived on the scene shortly thereafter and immediately commenced a murder investigation, culminating in the defendant's arrest.

After a jury trial in Superior Court (*Gray*, J.), the defendant was convicted of accomplice to first degree murder, conspiracy to commit murder, and tampering with a witness. On appeal, she raises the following issues: whether the pretrial publicity surrounding her case deprived her of an impartial jury; whether, in view of the publicity, the trial court failed to adequately safeguard the trial proceedings; whether the defendant should have been permitted post-verdict *voir dire* of the jury for alleged juror misconduct; whether the trial court erred in its supplemental instruction to the jury; whether the court erred in denying the defendant's motion to suppress tape recordings of her intercepted conversations; whether the court erred in submitting transcripts of the taped conversations to the jury; and whether the court erred in refusing to allow the defendant to recall two witnesses for renewed cross-examination. For the reasons set forth below, we affirm.

Viewing the evidence presented at trial in the light most favorable to the State, the jury was warranted in finding the facts as set forth in this opinion. In the fall of 1989, the twenty-two-year-old married defendant was the director of media services for the school district that included Winnacunnet High School in Hampton. She met and befriended William Flynn and Cecelia Pierce, two fifteen-year-old high school students from Seabrook, and they and other students worked together after school hours to produce an orange juice commercial for a contest. Eventually, in February or March of 1990, the defendant and Flynn became sexually involved.

Shortly after their affair began, the defendant told Flynn that in order for them to continue their relationship they would have to kill

her husband, Gregory, a twenty-four-year-old insurance salesman to whom the defendant had been married less than a year. Eventually the defendant and Flynn together planned that Flynn would commit the murder with the help of his friends, and would stage the killing as if committed in the course of a burglary of the defendant's home. According to the plan devised by the defendant, she would leave open the bulkhead door to the basement of her home to provide entry for Flynn and the others before Gregory returned home. The perpetrators were to park their car in a shopping center behind the residence and change into dark clothes before approaching the apartment. The defendant advised Flynn that he and his accomplices should wear gloves to avoid leaving fingerprints and should ransack the apartment, taking away whatever they wanted as compensation. Pursuant to the defendant's plan, her husband was to be killed with a gun upon entering his home as if he had surprised burglars.

Flynn discussed the plan with his friends Pete Randall and Vance Lattime, Jr., also teenagers from Seabrook. With the aid of another boy, Raymond Fowler, Flynn set out from Hampton to commit the murder one night in April, using the defendant's car. When the two arrived at the defendant's apartment complex, however, they saw her husband's truck and abandoned the plan. After this unsuccessful attempt, Flynn recruited Randall and Lattime to help execute the plan. He told them that the defendant had agreed to pay them five hundred dollars each for committing the murder. Lattime provided his father's .38 caliber revolver and his grandmother's car to transport the boys from Seabrook to the defendant's Derry apartment.

After school ended on May 1, 1990, the defendant drove Flynn, Randall and Lattime to pick up Lattime's grandmother's car in Massachusetts. The defendant discussed with them the various details of the murder plan, seeking advice on how to react when she returned home and discovered her husband murdered. Lattime and Randall returned to Seabrook in Lattime's grandmother's car. The defendant drove Flynn back to Seabrook to meet them and then went to Winnacunnet High School to attend a meeting scheduled for that evening.

Flynn, Randall and Lattime picked up Fowler and drove to the defendant's residence. While Lattime and Fowler waited with the car at the shopping center, Flynn and Randall entered the defendant's apartment through the unlocked bulkhead into the basement. After ransacking both the upstairs and downstairs of the apartment, they waited for Gregory to return home, with Flynn carrying the gun and Randall holding a knife he had taken from the kitchen. When Greg-

ory came home, the boys forced him to his knees. While Randall with one hand held Gregory's head down and with the other hand held a knife in front of his face, Flynn shot him once in the head. Taking a pillowcase they had filled with jewelry, the boys fled to meet Fowler and Lattime, and the four drove back to Seabrook. The next day, Lattime replaced the gun among the rest of his father's collection.

On June 10, Ralph Welch, a friend of Lattime, told Lattime's parents that Randall and Lattime had admitted to him their participation in the murder. Lattime's parents took the gun to the Seabrook Police Department, accompanied by Welch, and subsequent ballistics tests confirmed that the gun had been used in the murder.

Worried because of Welch's intentions to go to the police, Randall and Lattime went to see Flynn and the defendant at the latter's new condominium in Hampton. After discussing the matter, the defendant drove them to Seabrook in an unsuccessful attempt to retrieve the gun. The next night, June 11, Lattime, Randall and Flynn were arrested.

Virtually daily before May 1, the defendant spoke with Cecelia Pierce, her student intern, about the plan to have Flynn murder her husband. The night before the boys were arrested, the defendant told Pierce of Welch's intention to report the boys to the police, and said that if Lattime and Randall were smart they would blame Welch and Fowler for the murder.

Pierce was questioned several times about the murder by the Derry police and denied any knowledge of it. On June 14, after hearing rumors of the impending arrest of an unidentified girl alleged to be involved, Pierce again met with the Derry police and told them of the defendant's involvement in the murder. She agreed to a phone tap of a conversation with the defendant and to wearing a recording device, or body wire, to record face-to-face conversations with the defendant. On July 12 and 13, with Pierce surreptitiously recording their conversation, the defendant warned Pierce that if Pierce told the truth to the police, Pierce would be an accessory to murder, and urged her to continue to lie. The defendant acknowledged that the boys had carried out the murder to look like a burglary as she had planned, and stated that "nothing was going wrong" until the boys told Welch about it. She stated that, if arrested, she would admit to the affair with Flynn but deny any involvement in the murder plot. She expressed concern that Lattime, who merely waited in the car during the murder, would eventually confess and implicate the others. Nevertheless, the defendant told Pierce she was confident

that, as between a sixteen-year-old "in the slammer facing the rest of his life" and herself, "with a professional reputation and a course that I teach," her denial would be believed. The defendant reminded Pierce that, by telling the truth, Pierce would be sending the defendant to prison for the rest of her life.

On August 1, 1990, the defendant was arrested in connection with the murder of her husband. In January 1991, Flynn, Randall and Lattime agreed to plead guilty to reduced charges and subsequently testified for the State at the defendant's trial. Another witness, Cindy Butt, a co-worker of Pierce, testified that a month prior to the murder, Pierce told her that she had a "friend named Pam who wanted to find somebody to kill her husband." George Moses, a high school student, testified that he knew the defendant at Winnacunnet High School and met her again while visiting his mother in prison. According to Moses, the defendant asked him to lie for her by claiming that he had overheard Pierce admit to lying to the police about the defendant's involvement.

The jury found the defendant guilty of all charges.

*I. Pretrial Publicity*

■ The defendant's arrest and the events leading up to her trial engendered extraordinarily heavy and widespread media coverage. Numerous articles appeared in the newspapers of the southern tier of New Hampshire, along with coverage in Lawrence and Boston, Massachusetts. By the time of the defendant's trial in March 1991, national media outlets, such as *Time* magazine, contained reports of the case. The defendant argues that this publicity was so pervasive and prejudicial that we must presume that it was impossible to select an impartial jury in Rockingham County in February 1991. She therefore contends that the trial court erred in not granting her motion for a change of venue and in not *sua sponte* ordering a continuance. Although the defendant bases her claim on both the State and Federal Constitutions, she relies primarily on federal law, and does not argue for a higher standard under the New Hampshire Constitution. Because we believe the principles are the same in any event, we address her argument under both constitutions, by reference to federal decisions. *See State v. Scarborough*, 124 N.H. 363, 368, 470 A.2d 909, 913 (1983).

■ Both the sixth amendment of the United States Constitution and part I, article 15 of the New Hampshire Constitution guarantee the right of a defendant to a trial by a fair and impartial jury. *State v.*

*Vandebogart*, 136 N.H. 107, 110, 612 A.2d 906, 908 (1992). This, however, does not require that

> "the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case."

*Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Dobbert v. Florida*, 432 U.S. 282, 303 (1977) ("One who is reasonably suspected of murdering [her husband] cannot expect to remain anonymous."); *State v. Nelson*, 103 N.H. 478, 484, 175 A.2d 814, 818 (1961) ("The very nature of the charges . . . could not fail to create general public interest with attendant widespread publicity through the various news channels."), *cert. denied*, 369 U.S. 879 *and* 369 U.S. 881 (1962).

 Pretrial publicity, as we stated in *State v. Laaman*, 114 N.H. 794, 331 A.2d 354 (1974), *cert. denied*, 423 U.S. 854 (1975), can cause inherent prejudice or actual prejudice. "[I]nherent prejudice . . . exists when the publicity by its nature has so tainted the trial atmosphere that it will necessarily result in lack of due process." *Id.* at 798, 331 A.2d at 357. Unlike a claim of actual prejudice, "which exists when the publicity has infected the jurors to such an extent that the defendant cannot or has not received a fair and impartial jury trial," *id.*, a claim of inherent prejudice does not require the defendant to show "actual identifiable prejudice," *id.* It is inherent, or presumptive, prejudice that the defendant argues resulted from the extensive press coverage of her case, and she suggests that we ignore her jurors' professions of impartiality.

As *Laaman* indicates, inherent, or presumptive, prejudice will only be found in cases where the publicity is of a certain nature. The United States Supreme Court has held that "*adverse* pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (emphasis added). The Court has also held, however, that the trial court's finding that a jury was impartial should only be overturned for manifest error. *Id.* at 1031–32.

In only one case, *Rideau v. Louisiana*, 373 U.S. 723 (1963), has the Supreme Court reversed a conviction based solely on presumptive prejudice resulting from pretrial publicity without regard to the ju-

rors' own *voir dire* testimony concerning their impartiality. There, film of the defendant's uncounseled custodial confession was broadcast three times on the local television station prior to jury selection. *Id.* at 724. Because "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality," *id.* at 726, the Court held that denial of the defendant's motion for a change of venue violated due process, *id.*, "without pausing to examine . . . the *voir dire* examination of the members of the jury," *id.* at 727.

Other than *Rideau*, the Supreme Court has reviewed claims of presumptive prejudice resulting from hostile pretrial publicity with reference to the jury *voir dire*. *See, e.g., Patton v. Yount*, 467 U.S. 1025; *Dobbert v. Florida*, 432 U.S. 282; *Murphy v. Florida*, 421 U.S. 794 (1975); *Irvin v. Dowd*, 366 U.S. 717. In *Irvin*, the pretrial news accounts included the defendant's confessions to six murders, his unaccepted offer to plead guilty in exchange for a ninety-nine-year prison sentence, and numerous opinions as to his guilt. *Irvin*, 366 U.S. at 725–26. As a result of a barrage of "continued adverse publicity," *id.* at 726, the Court found prejudice notwithstanding the jurors' professed ability to be impartial. Reviewing the jury *voir dire*, the Court found that eight out of the twelve members of the defendant's jury had already formed an opinion that the defendant was guilty and acknowledged a familiarity with the material facts of the case, "some going so far as to say that it would take evidence to overcome their belief." *Id.* at 728.

The defendant, unable to point to any identifiable, actual prejudice on the part of the jurors who decided her case, seeks to characterize the pretrial publicity surrounding her as equivalent to that in *Irvin*. She would thus have us similarly disregard the jurors' *voir dire* statements of impartiality. The first problem with her argument is seen in a comparison of the *voir dire* examinations. In *Irvin*, as noted above, two-thirds of the defendant's jury admitted to having formed an opinion about his guilt; they were seated despite the fact that the defendant, "having no more peremptory challenges, insisted [that they] should be excused for cause," *Irvin*, 366 U.S. at 724. Here, by contrast, no member of the defendant's jury expressed an opinion on *voir dire* that she was guilty. And, importantly, none sat on her jury over her objection. It is difficult to conclude in such circumstances that the trial court's finding that the jury was impartial constituted manifest error.

■ The second problem with the defendant's effort to equate her case with *Irvin* and *Rideau*, where the Court presumed the exist-

ence of prejudice, is in the kind of publicity involved. She refers us to the "avalanche of media attention" she received, primarily without focusing on the nature of the attention. As *Irvin* and *Rideau* make clear, however, it is the adverse nature of the publicity, not merely its quantity, that is critical in finding presumptive prejudice. *See Rideau*, 373 U.S. at 727 (community had seen and heard "not once but three times, a 'trial' of Rideau in a jail, presided over by a sheriff, where there was no lawyer to advise Rideau of his right to stand mute"); *Irvin*, 366 U.S. at 726 (community subjected to "continued adverse publicity").

We have carefully reviewed the massive amount of pretrial media material submitted by the defendant, comprising a several-inch-thick volume of newspaper accounts and videotaped television news stories. Several of these items, appearing immediately after the murder, were generated by the defendant herself, who granted extended interviews with the press. We agree that the publicity surrounding the defendant's case was enormous and, as claimed by some, unprecedented in this State. This "avalanche," however, is not enough. While "some of the pieces . . . are hostile in tone and accusatory in content[,] [t]he overwhelming bulk of the material submitted . . . consists of straightforward, unemotional factual accounts of events and of the progress of . . . investigations." *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976) (no presumed prejudice created by publicity about "Watergate" defendants), *cert. denied*, 431 U.S. 933 (1977). Distinguishing between straightforward factual publicity about a celebrated case and inflammatory, adverse press is crucial. "To ignore these real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community, whether they be notorious or merely prominent." *Murphy v. Florida*, 421 U.S. at 801 n. 4.

The defendant points with specificity to only one item as potentially prejudicing the jury venire because of its content and proximity to jury selection. Several nights before jury selection was to begin, a local television station, WMUR-TV, aired a special program entitled "Anatomy of a Murder," devoted to the defendant's case. Consisting of footage from earlier news broadcasts that included film of pre-arrest interviews with the defendant, of her arrest and that of the teenage boys, along with commentary by a station reporter, the program also mentioned three new indictments against the defendant. One of these indictments charged her with attempting to mur-

der a prospective witness. Suggesting a prejudicial influence on prospective jurors, the defendant points out that the evidence of the new indictments was not introduced at trial. Exposure to inadmissible evidence, however, is not sufficient to presume jury prejudice. *Cf. Patton v. Yount*, 467 U.S. at 1027 (no presumption of prejudice despite press reports of defendant's written confessions, inadmissible at trial). Moreover, the *voir dire* examination of the one prospective juror who stated he had seen the program belies any claim of prejudice. The venireman was vague in his recollection of the contents of the program and was questioned in depth about it by defense counsel. At the close of his examination of the man, defense counsel did not challenge him for cause. Ultimately, it was the State that exercised a peremptory challenge to strike him from the jury.

Not only was the bulk of the publicity merely factual reporting, analysis of the material submitted by the defendant for our review indicates that most of the items appeared after the jury had been selected and had been continually instructed by the trial court not to read or watch anything connected to the case. "Our system of justice is premised upon the belief that jurors will follow the court's instructions." *State v. Novosel*, 120 N.H. 176, 186, 412 A.2d 739, 746 (1980) (no abuse of discretion to refuse to poll jury regarding prejudicial publicity, where jury repeatedly admonished not to read or listen to news accounts).

The defendant has shown at most that the community from which her jury was drawn was exposed to extensive pretrial publicity that resulted in familiarity with her case. Mere familiarity, however, is not sufficient to presume prejudice. *Irvin v. Dowd*, 366 U.S. at 722; *State v. Laaman*, 114 N.H. at 800, 331 A.2d at 358. We have examined the *voir dire* of the jury and have found no evidence to support a claim of presumptive prejudice. Fifteen jurors were selected in five days, after thorough and intensive questioning by the court and counsel for both sides. Of the sixty-five prospective jurors individually examined, one was excused for cause because of "mixed feelings" about the defendant's guilt, another was excused for cause in part due to a negative preconception based on pretrial publicity, one was excused for cause after admitting a prejudice against the defendant, and another, challenged by the defendant due to publicity, was struck by the defendant peremptorily. All of the others excused for cause were excused for reasons other than publicity, such as an inability to understand the burden of proof. After eleven prospective jurors had been questioned, the judge remarked, "I'm surprised at

the number of people who have not read too many articles about this." On the third day of *voir dire*, after yet another prospective juror admitted to knowing little about the case, the judge stated, "I don't think the press is as effective as the press thinks the press is." Later the same day, in response to a juror who said the court would "probably find it hard to believe" that she knew very little about the case, the judge said, "Becoming increasingly easier to believe." One reason may be found in the responses of several prospective jurors who stated that they were preoccupied with news stories about the war: American troops were fighting in the Persian Gulf in late February 1991.

Another reason many of the prospective jurors were largely ignorant of the specifics of the defendant's case may have been the notice sent to them to report for service. The notice specifically advised the venire that they would be serving on the jury of "the *State vs. Pamela Smart* case." The defendant argues that the notices focused the venire's attention on the media accounts of the case. The record reveals, however, that fourteen of those individually examined stated that, upon receiving notification from the court about jury service, they deliberately avoided reading about the case, some stating that to do otherwise would not be "fair." The only prospective juror to state that he had read about the case after receiving jury notification was struck peremptorily by the State. The jury *voir dire* thus demonstrates that specific reference to the defendant's case in the notice to prospective jurors was not prejudicial and may even have had a salutary effect.

 The trial court and counsel for both sides conducted thorough and searching *voir dire*. When, on the afternoon of the third day, it was learned from a prospective juror that other prospective jurors were discussing the media while waiting in the jury room, the court summarily excused the remainder of the day's venire. This is evidence of the care taken by the trial court to ensure the selection of an impartial jury. *See Nelson*, 103 N.H. at 484, 175 A.2d at 819 (requiring three weeks to pick jury in widely publicized case not evidence of prejudice but rather shows court's "extreme care" in obtaining impartial jury). Moreover, the defendant's satisfaction with her jury at the time of selection may be reflected in the fact that she did not employ all of the peremptory challenges available to her, a fact relevant to a claimed lack of an impartial jury, *State v. Anaya*, 131 N.H. 330, 331, 553 A.2d 297, 298 (1988).

The defendant seeks to support her claim of jury prejudice with affidavits, appended to her motion for a new trial, of several potential

jurors who had been discharged. According to these affidavits, certain members of the pool discussed the case on the first day they reported for jury service, expressing the opinion that the defendant was guilty. There is no evidence that any such member of the jury pool was selected. Additionally, the record shows that no one who sat on the defendant's jury possessed a preconceived opinion of her guilt.

■ We now turn specifically to the defendant's claims that the trial court should have ordered a change of venue and a continuance. The trial court denied the defendant's motion for a change of venue prior to the jury *voir dire*, ruling that the defendant could renew the motion after *voir dire*. The defendant never availed herself of this invitation. *See Johnson v. Nash*, 135 N.H. 534, 536, 608 A.2d 200, 201 (1992) (issue not preserved where court granted leave to file further pleading and defendants failed to do so). We can only conclude from the defendant's failure to renew her motion, combined with her failure to make additional challenges for cause and to exhaust her peremptory challenges, that at the time of jury selection she believed she had obtained an impartial jury. Moreover, the trial judge, in his order denying the motion for a new trial, stated that his finding at the time of jury selection that the jury chosen "was absolutely and completely impartial . . . was, at the time, shared by both the defendant and [trial] counsel. There were no objections to the jury which was selected and each juror was specifically approved by counsel and the defendant individually." The defendant on appeal does not challenge this specific finding of fact by the trial court, and we find no error in the failure to change venue.

■ With respect to a continuance, the record indicates that one two-week continuance was requested by the defendant and granted by the trial court. According to the trial court, it "did not receive any additional motions to continue, and indeed proceeded after the short continuance on the insistence by defendant of her right to speedy trial." Although the defendant cites *United States v. Perez-Casillas*, 593 F. Supp. 794 (D.P.R. 1984), as support for her claim that the right to a continuance amidst pervasive publicity takes precedence over the interest in a speedy trial, she omits the significant fact that the defendants in that case affirmatively moved for a continuance until the publicity subsided. *Id.* at 796. In light of the defendant's apparent desire to proceed with her trial, our conclusion that the pretrial publicity was not so inflammatory as to preclude selection of an impartial jury, and the evidence that an impartial jury was in fact

selected, we will not fault the trial court for failing to act *sua sponte* to continue the trial.

 The trial court's determination of the impartiality of the jurors selected, essentially a question of demeanor and credibility, "is entitled . . . to special deference." *Patton v. Yount*, 467 U.S. at 1038 (quotations omitted). As the Supreme Court recently noted:

> "Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect, and brings to his evaluation of any such claim [of prejudice] his own perception of the depth and extent of news stories that might influence a juror."

*Mu'Min v. Virginia*, — U.S. —, —, 111 S. Ct. 1899, 1906 (1991). We hold that, notwithstanding extensive pretrial publicity, there was no manifest error in the trial court's determination that an impartial jury had been selected for the defendant's trial.

## II. Trial Atmosphere

The defendant contends that the trial judge did not adequately safeguard the trial proceedings from what she claims was a "circus-like atmosphere" created by "media frenzy." Relying primarily on *Sheppard v. Maxwell*, 384 U.S. 333 (1966), where the Supreme Court reversed a conviction on a finding of presumed prejudice, she seeks to compare the *Sheppard* trial, with its "bedlam . . . and disruption," *id.* at 355, to her own. After review of *Sheppard* and of the record in this case, however, including thirty hours of videotape of the trial, this court is convinced that any comparison with *Sheppard* is illusory, and that the trial court here adequately protected the defendant's right to a fair trial. Because of the defendant's heavy reliance on *Sheppard*, we begin with an examination of that case.

The Supreme Court held in *Sheppard* that in "the totality of the circumstances," *id.* at 352, the defendant was "deprived of that judicial serenity and calm to which [he] was entitled." *Id.* at 355 (quotation omitted). These circumstances included a background of pretrial publicity described by the court as "virulent." *Id.* at 354. Headlines had "repeatedly stressed Sheppard's lack of cooperation with the police," *id.* at 338, and "disclosed that [he] had 'again . . . refused to take a lie detector test,'" *id.* at 339; television and radio broadcast a three-day coroner's inquest held in a high school gymnasium, to which Sheppard had been subpoenaed and at which his counsel were

not allowed to participate, *id.* at 339; front-page editorials appeared, including one charging that Sheppard was "'getting away with murder,'" *id.*; and the names and addresses of all of the prospective jurors were published, leading to the receipt by all of them of "anonymous letters and telephone calls, as well as calls from friends, regarding the impending prosecution," *id.* at 342.

At Sheppard's trial, according to the Supreme Court, "bedlam reigned . . . and newsmen took over practically the entire courtroom . . . ." *Id.* at 355. A table accommodating twenty members of the press had been set up inside the bar within a few feet of counsel table, *id.* at 355, making "confidential talk among Sheppard and his counsel almost impossible," *id.* at 344, and causing "constant commotion within the bar," *id.* at 355; virtually all of the seats in the courtroom had been assigned by the court to the press, whose "movement in and out of the courtroom often caused so much confusion that, despite the loud-speaker system installed in the courtroom, it was difficult for the witnesses and counsel to be heard," *id.* at 344; reporters clamored for access to chambers discussions between the court and counsel, "and often these matters later appeared in newspapers accessible to the jury," *id.*; and newspapers throughout the trial featured photographs of the jurors, who "were thrust into the role of celebrities by the judge's failure to insulate them from reporters and photographers," *id.* at 353. While inflammatory newspaper articles and television and radio broadcasts appeared during the trial, containing information not introduced at trial, the judge merely made "suggestions" and "requests" to the jurors that they not expose themselves to extrajudicial comment on the case. *Id.* at 353. Blaming the trial judge for succumbing to the press by not controlling the "carnival atmosphere at trial" and by failing "to reduce the appearance of prejudicial material and to protect the jury from outside influence," *id.* at 358, the Supreme Court concluded that Sheppard had been denied due process, *id.* at 335.

Nothing in the conduct of the defendant's trial remotely resembled these conditions, despite the media presence. From the outset, even before commencement of the jury *voir dire*, the trial judge made emphatically clear that he, and not the press, was in control of his courtroom. In his opening instructions to the panel, the judge explained that the press, including television cameras, would be present during the trial, stating:

"The press during the trial cannot photograph jurors. The press during the trial and jury voir dire cannot mention

your names, cannot interview you, cannot publish your names, and cannot photograph you at any time during the trial. But there will be cameras in here, and I'll tell you right up front as well, this is not the first time that has been done in New Hampshire where there has been press coverage and cameras in the courtroom. You'll find if there are—the jury, the final jury is among you here, that within a half an hour you pay no attention to the fact that cameras are there or that the press is in the courtroom. It's just they're there."

The trial judge specifically instructed the media regarding what it could and could not do inside and outside the courtroom. "After consultation with counsel both for the Defendant and the State," the judge assigned the media three rows of seats outside of the bar and outside of the direct view of the jury. He permitted only two video cameras in the courtroom, and instructed the press that the jurors "under no circumstances were . . . to be photographed at any time either in or out of the courtroom and were never to be approached by any media representatives." Except for one instance, when the jury was inadvertently photographed while on the view, there is no evidence that the press did not follow the court's instructions.

Although the defendant characterizes her trial as a "Roman circus" based on the conduct of the press, the only evidence to support this claim is the occasionally audible snapping of shutters of still cameras. This occurred once during Pierce's testimony and twice while the defendant testified. Each time the court admonished the photographers, and no real disruption occurred. The defendant presses a claim that "photographers would often times stand in order to get their pictures . . . , . . . caus[ing] a commotion," an allegation that the trial court in its order on her motion for a new trial specifically found to be false. Her further allegation that the media, permitted to review exhibits on a table inside the bar during one recess, were free to "scrutinize notes and papers left out by defense counsel" is similarly not borne out by the record. Nothing indicates that the media came near the separate table at which defense counsel sat.

■ That the trial judge exerted and maintained control over the proceedings is further illustrated by his numerous and forceful instructions to the jurors not to expose themselves to any press accounts of the case. Upon selection for service, each juror was instructed individually not to read or listen to anything in connection with the case and about the importance of that admonition. The

judge also told them to report immediately to the court or sheriff any attempts made by anyone to contact them about the case. After the first day and then daily throughout the trial, the judge continually reminded the jurors that they were not to discuss the case or in any way come into contact with press accounts. The defendant complains that at the end of the first day of trial, the judge only instructed the jury not to discuss the case, omitting the admonition about media exposure. She makes no specific claim of prejudice arising from this one lapse, however, and we are convinced that on this record there was none.

Some of what the defendant contends was circus-like in the conduct of the press is alleged to have occurred outside of the courtroom, where, for example, the defendant was allegedly mobbed by photographers. The trial court, however, had kept the jury in a secured section of the courthouse away from the media, and when the jurors entered the courtroom it was through a separate, locked hallway, secured from media access. The defendant does not allege that the jury was aware of or in any way prejudiced by this spectacle.

To support her claim that the media's impact on the jury was "overwhelming," the defendant submitted an audiotape recording contemporaneously made by one of the jurors, in which the juror chronicled her daily impressions of the trial in lieu of discussing the case. Although several negative comments about the press appear in the tapes, they essentially amount to observations by the juror of the media's mere presence. Notably, when the juror spoke of the press, it was distinct from and as an aside to the essence of the tapes, which was a recapitulation of each day's testimony. The tapes make clear that the juror took her task seriously, as she recounted: "We're all listening to every single word, every word, taking notes, paying attention, concentrating, and we will all through the trial"; "I, for one, have every intention of keeping an open mind"; and, "Right now I'm still presuming her to be innocent, and I'll continue to do so all the way through until all the evidence is in." Rather than lending strength to the defendant's claim, the tapes show a thoughtful, conscientious juror determined to fulfill her obligations to be impartial and to follow the court's instructions, uninfluenced by the presence of the media.

We also take note of a comment made by the judge to the jury at the close of his final charge. As he concluded, the judge gave the standard instruction with respect to the importance of the case to the defendant, to the State and to the jury, and cautioned that the

presence of the press did not make the case "any more important than any other criminal case." In the course of this instruction, he remarked parenthetically, "Because the press is here, however, and has been through this trial, and *you've been, I must say, magnificent in your ability to ignore the fact that there are many press and many people in this courtroom . . . .*" (emphasis added). Such a spontaneous observation by the trial court, who was in the best position to perceive the impact of the media on the jury throughout the three-week trial, is entitled to considerable weight upon review. *Cf. State v. Mills*, 136 N.H. 46, 50, 611 A.2d 1104, 1106 (1992) (great deference owed trial judge's decision on witness competency because of his "overall firsthand impressions" and "[b]ecause so much depends upon his observation of the witness") (quotations omitted); *Maguire v. Merrimack Mut. Ins. Co.*, 133 N.H. 51, 55, 573 A.2d 451, 454 (1990) (trial judge witnesses proceedings firsthand and "'may have insights not conveyed by the record'").

Finally with respect to the defendant's claim that her trial was conducted in a circus-like atmosphere, the court has carefully reviewed the videotapes of thirty hours of the trial, recorded by the local television station and furnished as an exhibit. They vividly demonstrate what cannot be captured from the cold transcription of proceedings, namely, that the trial was conducted not in a carnival-like manner, but in the calm, dignified manner to which the defendant was entitled. Witnesses and counsel were plainly audible, no media representatives were inside the bar, and there was no commotion. We might add that the videotapes have given us an unusual near-firsthand glimpse of the trial judge at work. His commanding presence throughout, shown by his demeanor with counsel and with the jury, was apparent. The defendant's trial took place in a courtroom dominated not by the media but by the presiding judge.

 The defendant also argues that the trial court should have granted her motion to sequester the jurors throughout the trial in order to protect them from exposure to press accounts of the trial. Sequestration is "an extreme measure, one of the most burdensome tools of the many available to assure a fair trial." *United States v. Porcaro*, 648 F.2d 753, 755 (1st Cir. 1981) (quotation omitted). Furthermore, the decision to grant a motion to sequester the jury is within the sound discretion of the trial court, *see State v. Breest*, 116 N.H. 734, 751, 367 A.2d 1320, 1333 (1976), and is not required simply because of media attention, *United States v. Peters*, 791 F.2d 1270, 1298 (7th Cir.), *cert. denied*, 479 U.S. 847 (1986).

■ As with any claim of abuse of the trial court's discretion, the defendant must show that the court's ruling was unreasonable and prejudicial to her. We held in *State v. Pugliese*, 122 N.H. 1141, 455 A.2d 1018 (1982), that there was no abuse of discretion in the trial court's refusal to poll the jury regarding prejudicial newspaper articles, published during trial, where there was no evidence "that any member of the jury had read the articles and that this had resulted in deprivation of the defendant's right to a fair trial." *Id.* at 1147, 455 A.2d at 1022. We hold that a defendant challenging a trial court's denial of a motion to sequester the jury during trial must meet the same test. *See Burke v. State*, 484 A.2d 490, 500 (Del. 1984) (absent showing of actual prejudice, refusal of trial judge to sequester jury prior to deliberations not abuse of discretion).

Failing to point to any specific prejudicial news items observed by any juror, the defendant claims merely that "the publicity problem was obvious." We agree. The trial court handled the problem as outlined above, *i.e.*, by shielding the jury from reporters and photographers, instructing the media to keep its distance from the jury, and regularly instructing the jurors to avoid press accounts. As stated above, we will not assume that the jurors disobeyed the admonitions not to read or listen to any media accounts of the case, as "[o]ur system of justice is premised upon the belief that jurors will follow the court's instructions." *Novosel*, 120 N.H. at 186, 412 A.2d at 746. In lieu of imposing on the jury the hardship of sequestration for the more than two weeks of trial, the steps taken by the trial court were adequate.

■ At the conclusion of the trial, at the end of the first day's deliberations, the judge, on the defendant's motion, ordered the jury sequestered for the duration of its deliberations. Defense counsel had argued that "[t]he flavor of this thing's changed a little bit with regard to the media" in that, while the media that had been present all along "seem[ed] [to] know the rules," there was at that time "a completely different crew out there. . . ." Although the judge ordered that sequestration would not begin until the end of the following day, the record shows that this decision was made in order to accommodate the jurors, who had not come to the courthouse prepared to be sequestered that evening. Defense counsel did not object to this procedure, and in fact had suggested to the court that it should be "very careful with regard to instituting sequestration at this point in time so that it would at least be somewhat reasonable to these folks," because defense counsel did not "know if this jury has been properly

placed on notice that sequestration could have been a possibility." We conclude that, by handling the media and the jury as he did throughout the trial and by sequestering the jury when a change in circumstances appeared to warrant that action, the trial judge acted reasonably to protect the defendant's rights. Absent a specific showing that the jury had been tainted by exposure to publicity, we hold that the court did not abuse its discretion in not ordering sequestration from the outset of the trial.

## III. Alleged Juror Misconduct

After the trial, the defendant filed a motion for individually sequestered *voir dire* of the jury on the basis of a specific allegation of misconduct by one juror. The defendant does not pursue that claim on appeal. Subsequently, she moved for a new trial on the ground of juror misconduct, and in her prayer for relief requested the trial court to "summons all deliberating jurors before the Court in order to conduct an evidentiary hearing to determine the extent and prejudicial effect of juror misconduct." In that motion the defendant alleged that the juror who had created the audiotapes of her trial recollections did so for financial gain, and that jurors were permitted to consume alcoholic beverages after deliberations while they were sequestered. On appeal, she presses her request for individual examination of the jurors only with respect to the alleged consumption of alcohol during deliberations. With respect to the juror's audiotapes, the defendant does not seek examination of the individual jurors, but rather relies upon the tapes as an independent ground for reversal.

The decision to *voir dire* or poll the jury after its verdict is within the discretion of the trial court. *State v. Pinardville Athletic Club*, 134 N.H. 462, 468, 594 A.2d 1284, 1288 (1991). While a trial court exercising its discretion must investigate colorable claims of improper influence on the deliberative process, it "must not allow jurors to be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct." *Neron v. Tierney*, 841 F.2d 1197, 1204 (1st Cir.) (quotations omitted), *cert. denied*, 488 U.S. 832 (1988).

The defendant's argument concerning the alleged consumption of alcohol by the sequestered jury stems from a newspaper article written by a juror after the trial, in which he stated that, at the motel after the second day's deliberations had ended, the jurors were told "that the judge had OK'd two drinks per juror, though the state wouldn't pick up the tab for alcohol." Citing *State v. Bullard*, 16 N.H.

139 (1844), and *Leighton v. Sargent*, 31 N.H. 119 (1855), which prohibit the use of alcohol by a deliberating jury, the defendant contends that the trial court's permitting the jurors to have two drinks at the motel entitled her to *voir dire* them "as to if, when and where any of them had accepted the trial court's invitation."

The trial court held a hearing on the defendant's motion for a new trial alleging juror misconduct. At the hearing, counsel for the defendant conceded that he had no evidence, "none whatsoever," that the jury had deliberated under the influence of alcohol. He admitted that the suggestion that the jurors were deliberating in their separate motel rooms on the night they were sequestered, or that they had even had alcoholic beverages that evening, was "pure speculation." Unsupported speculation does not entitle a defendant to have the trial court interrogate the jurors about alleged impropriety in deliberations. *State v. Donovan*, 120 N.H. 603, 607, 419 A.2d 1102, 1104–05 (1980). The trial court did not abuse its discretion in refusing to poll the jury based on the defendant's sheer conjecture.

The defendant next contends that the existence of the tape-recorded recollections of a juror is evidence of juror misconduct requiring a new trial. In her motion she alleged that the recordings had been made for the purpose of profiting from their sale after the trial. At the hearing on the motion the State introduced affidavits, rebutting the material submitted by the defendant, supporting its claim that the recordings became the subject of possible sale only after offers by the defendant's attorneys to buy them. Defense counsel did not call the juror as a witness at the hearing, although the trial court afforded him the opportunity to do so. The evidence supports the trial court's finding that the recordings were made for the purpose stated by the juror on the tapes themselves, namely, for her own personal use. Conceding that he had no evidence that the juror formed an intent to sell the tapes at any time during her service as a juror, defense counsel argued the existence of the appearance of impropriety. On this record, however, we agree with the trial court's finding that the defendant failed to produce any evidence whatsoever of juror misconduct, and that the trial court properly denied the motion for a new trial on this ground.

*IV. Supplemental Jury Instruction*

During deliberations the jury sent out a question to the judge. After a request to clarify, the following question was then transmitted: "In your charges, Element 1 under accomplice states 'the State

alleges that the defendant aided William F. in the planning or com-
mission of the murder of Gregory Smart by taking certain actions,
including . . . .' Are all other actions excluded?" The trial court sent
the jury the following answer: "Madame Forelady and Members, the
burden is on the State to prove the elements of the charge. You may
consider all the evidence before you whether the act was specifically
alleged or not. The answer to your specific question is no."

■■ ■■ The defendant objected, arguing that the State was
bound by the acts alleged in the indictment. On appeal, however, she
argues that the supplemental instruction was misleading, failed to
dispel alleged jury confusion, and erroneously lacked reference to
the necessity for proof beyond a reasonable doubt. As none of these
grounds for objecting to the instruction was raised below, they will
not be considered on appeal. *State v. Wood*, 132 N.H. 162, 165, 562
A.2d 1312, 1314 (1989). Moreover, the only ground raised below not
having been briefed, it is deemed waived. *State v. Field*, 132 N.H.
760, 765, 571 A.2d 1276, 1279 (1990). We note, however, that the issue
waived was without merit. *See State v. Therrien*, 129 N.H. 765, 769,
533 A.2d 346, 348 (1987) (accomplice may be convicted on proof of
acts not specified in indictment).

## V. Admissibility of Recorded Conversations

The defendant argues that her taped conversations with Pierce,
recorded pursuant to RSA 570-A:2, II(d), should have been sup-
pressed, contending that Pierce's consent was invalid under part I,
article 19 of the New Hampshire Constitution and the fourth amend-
ment to the United States Constitution, and that the purported stat-
utory authorization was therefore invalid; that the interceptions
violated her State and federal constitutional rights to counsel; that
failure to seek judicial authorization for the intercepts violated the
separation of powers clause, part I, article 37, of the New Hampshire
Constitution; and that the interceptions violated Rule 4.2 of the New
Hampshire Rules of Professional Conduct.

In her motion to suppress the recordings, the defendant argued
that the alleged invalidity of Pierce's consent made the recordings
unlawful under RSA 570-A:2, II(d). Her argument on appeal that
Pierce's lack of consent resulted in a violation of the defendant's arti-
cle 19 and fourth amendment rights is therefore not properly pre-
served. *See State v. Wisowaty*, 133 N.H. 604, 607, 580 A.2d 1079, 1080
(1990) (issues not raised in trial court not considered on appeal).

The defendant bases her statutory claim of invalid consent on the
fact that Pierce, sixteen years old at the time, was a minor and on the

allegation that Pierce was coerced. The motion to suppress, however, asserted as a ground for finding lack of consent only Pierce's lack of capacity due to her minority. The State argues that any argument that Pierce was coerced is therefore not preserved. The record of the suppression hearing shows, however, that the defense tied its allegation of invalid consent to the facts surrounding this particular minor's decision to participate in the intercepts, including alleged pressure by police officers, rather than relying on a claim of *per se* incapacity due to minority. Moreover, in ruling on the motion the trial court expressly found no undue pressure on Pierce by the police. The issue is therefore properly before us.

At the hearing on the motion to suppress, Pierce testified about the events leading up to her decision to agree to the intercepts. She stated that when she lied to the Derry police during an interview on June 11, 1990, about her knowledge of the murder, Derry police Captain Jackson became angry with her. She inferred that the police knew of the defendant's involvement and that if they discovered Pierce was lying, she would be charged with "hindering an investigation." After another interview with the police on June 14, Pierce agreed to record telephone conversations with the defendant and to wear a body wire for face-to-face conversations. Pierce's mother, present at both police interviews, discussed with Pierce the advisability of participating in the intercepts prior to each one. Her signature appears with Pierce's on the consent form for the first intercept. According to Pierce, the police explained to her, before she signed the consent forms for each intercept, her right to refuse and that she "wasn't in any trouble at all." She stated that she did not consent to the intercepts out of fear of being arrested. Detective Pelletier of the Derry Police Department also testified that he witnessed her signatures on the consent forms after explaining to her each time that the decision was hers and that she could refuse.

We conclude that the evidence supports the finding that Pierce's consent was voluntary. The trial court found, "after viewing her on the stand," that Pierce was "of sufficient maturity" to consent, and we will defer to that finding in light of the trial judge's unique vantage point in assessing the witnesses before him. *See State v. Mills*, 136 N.H. at 50, 611 A.2d at 1106 (because, in determining witness competency, so much depends on trial judge's observation of witness, great deference given to judge's determination). We also agree with the trial court that on this record there is nothing to suggest undue pressure by the police. Pierce acknowledged that she

had originally lied to the police and that they apparently knew it. Their warnings to her that she could be prosecuted for hindering an investigation if they discovered she was not being truthful were not threats of illegitimate police action, *see United States v. Kolodziej*, 706 F.2d 590, 594 (5th Cir. 1983) (where threat of police action not illegitimate, consent to intercept valid) (citation omitted); "a decision to consent is not rendered involuntary merely because it is induced by a desire to avoid the possibility of a well-founded prosecution." *Com. v. Clark*, 533 A.2d 1376, 1379 (Pa. 1987); *cf. State v. Valenzuela*, 130 N.H. 175, 184, 536 A.2d 1252, 1258–59 (1987) ("What is crucial . . . is the defendant's voluntary disclosure of evidence to the agent-informer, not the agent-informer's interest or motivation when he informs the government."), *cert. denied*, 485 U.S. 1008 (1988). Pierce's consent to the intercepts was valid under the statute.

The defendant's claim that her sixth amendment right to counsel was violated by the recorded intercepts is based on the fact that, prior to the July body wire intercepts, although neither arrested nor charged with any offense, she had retained counsel and made that fact known to an assistant attorney general. This claim is foreclosed by our decision in *State v. Kilgus*, 128 N.H. 577, 519 A.2d 231 (1986), where we held that the federal constitutional right to counsel was not infringed by recording the defendant's conversations prior to the institution of criminal charges. *Id.* at 593–94, 519 A.2d at 242; *see Hoffa v. United States*, 385 U.S. 293, 308–09 (1966).

She next argues that her part I, article 15 right to counsel had attached prior to the body wire recordings when she and her attorney notified the attorney general's office of her desire to deal with the State only through an attorney. Contending that her right to counsel under the State Constitution is greater than under the sixth amendment, she asserts in her brief that *State v. Tapply*, 124 N.H. 318, 470 A.2d 900 (1984), held that part I, article 15 "affords to all persons suspected of criminal activity the right to counsel." This is an exaggerated view of our holding in *Tapply*, where the defendant was subjected to custodial interrogation, attempted to invoke his right to have counsel present for questioning, and was discouraged from doing so by the police, *id.* at 324, 470 A.2d at 904. *Tapply* did not purport to announce so broad a rule as the defendant contends.

At the time of the intercepted conversations, the defendant had not been arrested and had no charges pending. We have never held that the State constitutional right to counsel, outside of custodial questioning, attaches prior to the commencement of adversarial

proceedings. *See State v. Roberts*, 131 N.H. 512, 517, 556 A.2d 302, 305 (1989); *State v. Scarborough*, 124 N.H. at 370, 470 A.2d at 914 (1983). The defendant urges us to adopt the New York rule, first articulated in *People v. Skinner*, 52 N.Y.2d 24, 436 N.Y.S.2d 207, 417 N.E.2d 501 (1980), that once an individual is represented by counsel on the matter on which the State seeks to question her, no waiver of counsel is valid unless made in the presence of counsel. We have previously considered and rejected the reasoning behind the strict New York rule on which the defendant relies, *see Scarborough, supra* at 370, 470 A.2d at 914 (expressly declining to follow *Skinner*), and we again find the argument unpersuasive. *See also State v. Lamb*, 125 N.H. 495, 496, 484 A.2d 1074, 1075 (1984) (reaffirming *Scarborough's* rejection of the New York rule).

Basing her final constitutional challenge to the intercepts on the separation of powers clause, the defendant contends that the recordings were improperly authorized by the assistant attorney general because he was not a "neutral and detached magistrate." This argument is without merit. It falls as a consequence of our holding in *Kilgus*, 128 N.H. 577, 519 A.2d 231, that the fourth amendment and part I, article 19 do not apply to such consensual intercepts. *See id.* at 591–92, 519 A.2d at 240–41. Because no warrant was required, neither was the neutrality and detachment of a judicial officer.

Finally, the defendant argues that the intercepted recordings should have been suppressed because they were obtained in violation of Rule 4.2 of the New Hampshire Rules of Professional Conduct. The State counters that the rule does not apply to the investigatory stage of criminal proceedings, and that even if it were to apply, suppression is not the appropriate remedy for a violation.

Rule 4.2 of the Rules of Professional Conduct provides:

> "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

We have not previously had occasion to decide whether the Rules of Professional Conduct bar a prosecutorial agent from contacting a suspect whom the State knows is represented by counsel. Several federal courts have considered the issue pursuant to the nearly identical Disciplinary Rule 7-104 (A)(1) of the Code of Professional Responsibility. While there is agreement that the rule applies to criminal prosecutions as well as to civil litigation, *see United States*

*v. Ryans*, 903 F.2d 731, 735 (10th Cir.), *cert. denied*, — U.S. —, 111 S. Ct. 152 (1990), the courts that have considered the question do not agree on whether the rule applies in the investigatory stage of criminal prosecutions, *id. Compare United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988) (applying ethical rule to government's non-custodial, pre-indictment use of "sham" grand jury subpoena), *cert. denied*, — U.S. —, 111 S. Ct. 192 (1990) *with United States v. Fitterer*, 710 F.2d 1328 (8th Cir.) (refusing to apply rule prior to indictment), *cert. denied*, 464 U.S. 852 (1983), *and United States v. Lemonakis*, 485 F.2d 941 (D.C. Cir. 1973) (same), *cert. denied*, 415 U.S. 989 (1974).

We find persuasive the reasoning in *Ryans* that leads to the conclusion that the rule "was not intended to preclude undercover investigations of unindicted suspects merely because they have retained counsel," *Ryans*, 903 F.2d at 739:

> "In contrast to [N.H. Rule of Professional Responsibility 4.3, concerning a lawyer's dealings with] a 'person' who is not represented by counsel, [Rule 4.2] prohibits communications with a 'party.' Black's Law Dictionary defines party as 'a litigant, or a person directly interested in the subject matter of a case.' Moreover, the rule concerns a lawyer's conduct ['[i]n representing a client'], and is limited to communication ['about the subject matter of the representation'] with a party represented by counsel ['in the matter']. Although the [Rules] [do] not define these terms, the rule appears to contemplate an adversarial relationship between litigants, whether in a criminal or a civil setting.
>
> . . .
>
> The rule requires that the lawyer respect an adverse party's choice to be represented by skilled counsel. The rule appears to be intended 'to protect a defendant from the danger of being "tricked" into giving his case away by opposing counsel's artfully crafted questions.' [*United States v.*] *Jamil*, 707 F.2d [638,] 646 [(2d Cir. 1983)]. Logically, these concerns are implicated after the parties are in an adversarial relationship."

*Id.*

While we do not suggest that a prosecutor or prosecutorial agent may never be in violation of the rule prior to indictment, on the facts presented here, where the defendant was not in custody and

had not been criminally charged, we find no ethical violation in the interception of her conversations.

## VI. Transcripts of Recordings of Intercepted Conversations

The defendant argues on appeal that the trial court erred in submitting to the jury transcripts of her tape recorded conversations with Pierce, claiming that the transcripts were neither accurate nor authenticated. At trial, when the tapes were about to be played and the transcripts handed out for the jurors to read along, defense counsel expressed concern that the transcripts were "misleading" because they allegedly failed to account for the "doubling" of voices that occurs when two parties speak at once. No objection was made that the transcripts were not authenticated, and thus none is preserved for review. *See State v. Wisowaty*, 133 N.H. at 607, 580 A.2d at 1080.

The court overruled the defendant's objection to the use of the transcripts, and instructed the jury before the first tape was played as follows:

> "To the extent, if any exists, that the tape itself differs from what you are reading along in the transcript, you will use the tape in your consideration of the evidence in this case and not the transcript."

The court instructed the jury again, after the second tape was played, to "use what you hear and not what you read" if there was any discrepancy, and several times during its final charge the court again told the jury that the tapes must govern over any inconsistency that might appear in the transcripts.

Evidentiary rulings are within the trial court's discretion, and "[a]n appellant claiming trial court error in abusing discretion has the burden to demonstrate that the discretionary ruling is clearly untenable or unreasonable to the prejudice of his [or her] case . . . ." *State v. Cochran*, 132 N.H. 670, 672, 569 A.2d 756, 757 (1990). Neither at trial nor in her brief did the defendant make any particularized showing of inaccuracies in the transcripts relative to the recordings or how she may have been prejudiced thereby. The trial court's instructions to the jury adequately addressed the defendant's objection, and we find no abuse of discretion.

## VII. Re-opening Cross-examination of Prosecution Witnesses

The defendant's final argument concerns the trial court's refusal to allow her to recall Flynn and Lattime for further cross-examina-

tion or as witnesses in her case-in-chief. She challenges the trial court's rulings as violative of her rights of confrontation under the sixth amendment and part I, article 15, her rights under the federal due process clause and part I, article 15 to produce all proofs favorable to her, and as an abuse of discretion.

The issue arose as a result of the discovery of letters that Flynn and Lattime wrote from jail during the trial to an inmate at the New Hampshire State Prison. The letters came into the possession of the defendant's attorneys after they had completed cross-examination of the two witnesses. The defendant asked to be permitted to recall the witnesses for further cross-examination to impeach their credibility on the basis of the contents of the letters. While not claiming that the letters contained any inconsistencies with the substance of the boys' testimony, defense counsel pointed to specific items as warranting further examination. He noted that the letters contained references to the witnesses' decisions to plead guilty and testify against the defendant, to possessing photographs of the defendant, to their interest in the media attention, to Flynn's threat of violence against a prison inmate, and a profane reference to the defendant's jury.

The trial court, after reviewing the letters, denied the motion to recall the witnesses, finding nothing in the letters that could not have been inquired into on cross-examination. During her case-in-chief, the defendant moved for an order to transport Flynn and Lattime to court as witnesses for the defense. The trial court denied the motion, characterizing it as an attempt by the defense to gain by direct examination what had been denied previously, after having had a "fully utilized" opportunity for cross-examination. The court stated it had "reviewed all the letters in question and has found that none of them contain any relevant material which would be of aid to the jury. The letters contain no information which in any way contradicts the testimony of the two individuals while on the witness stand but at best show their attempts at jailhouse bravado."

A defendant's State and federal constitutional rights to confront the witnesses against her include the right to inquire on cross-examination into a witness's motives for testifying in order to attack his credibility. *State v. Brown*, 132 N.H. 520, 524, 567 A.2d 544, 546 (1990); *see State v. Benoit*, 126 N.H. 6, 21, 490 A.2d 295, 306 (1985); *see also Davis v. Alaska*, 415 U.S. 308, 316 (1974). For a trial judge to completely bar cross-examination in a proper area of inquiry violates the right of confrontation. *State v. Chaisson*, 123 N.H. 17, 32–33, 458 A.2d 95, 104 (1983). Once a defendant has been permitted a threshold

level of inquiry, however, the constitutional standard is satisfied, and the judge's limiting of cross-examination is measured against an abuse of discretion standard. *Brown*, 132 N.H. at 524, 567 A.2d at 547.

Furthermore, once a witness has left the stand, "he cannot be recalled without the permission of the Court." SUPER. CT. R. 69. "Our case law supports the discretion of the trial court in this matter." *State v. Duff*, 129 N.H. 731, 736, 532 A.2d 1381, 1384 (1987). To constitute an abuse, the court's discretion must have been exercised for reasons "clearly untenable or unreasonable to the prejudice of [the defendant's] case." *State v. Gooden*, 133 N.H. 674, 677, 582 A.2d 607, 609 (1990); *see Duff, supra* at 737, 532 A.2d at 1385 (no abuse of discretion where defense counsel had "ample opportunity to cross-examine the witness").

The record here shows that the defendant was not prohibited from cross-examining Flynn and Lattime in areas relevant to impeach their credibility through exposing their motives for testifying. Defense counsel conceded as much at trial. Although he argued that the letters contained "new information," he acknowledged, "Are there new issues that we want to talk about with these gentlemen? I think not. It goes to issues they talked about." According to the defendant, the letters imply that the boys had the opportunity to talk with each other in jail, supporting her theory that they collaborated to fabricate their testimony against her. They also show, according to the defendant, Flynn's obsession with her and lack of remorse, and portray a colder individual than Flynn displayed on the stand. A review of the extensive cross-examination of Flynn, Lattime and Randall reveals that all of these areas had been explored. All testified that they had talked about the case and admitted that part of their motivation in cooperating with the State was out of loyalty to each other. Flynn admitted his obsession with the defendant, and also admitted that within days of the murder he participated in an unrelated burglary and committed theft. Lattime testified about laughter in the car on their way home to Seabrook after the murder and about how he and Flynn had laughed on their way to the youth detention center after being arraigned for first degree murder.

We hold that the trial judge acted within his discretion in refusing to allow the witnesses to be recalled for further cross-examination on this thoroughly trodden ground. The defendant's additional argument for the right to recall the witnesses in her case-in-chief raises no basis, distinct from the cross-examination claim, to

rule otherwise. The right to produce favorable proofs under part I, article 15 does not grant the right to present cumulative testimony, *State v. Adams*, 133 N.H. 818, 826, 585 A.2d 853, 857 (1991), nor does the federal guarantee of due process afford such a right, *see Washington v. Texas*, 388 U.S. 14, 16, 23 (1967) (right to compulsory process denied when State "arbitrarily denied" right to put on stand witness "vital to the defense").

## VIII. Conclusion

Finally, the defendant urges us to reverse on the theory that, although the errors complained of may not standing alone require reversal, their cumulative effect was sufficiently prejudicial to warrant a new trial. This argument is predicated, however, on the existence of error in the first instance. As we have found none, the argument fails.

*Affirmed.*

All concurred.