Merrimack
No. 92-736

THE STATE OF NEW HAMPSHIRE

v.

DAVID DECKER

April 21, 1994

*Jeffrey R. Howard*, attorney general (*Ann M. Rice*, assistant attorney general, on the brief and orally), for the State.

*James E. Duggan*, chief appellate defender, of Concord, by brief and orally, for the defendant.

THAYER, J.   The defendant, David Decker, was found guilty of the first degree murder of Anthony Bardas after a jury trial in Superior Court (*McHugh*, J.). On appeal he contends that the trial court should have suppressed his confession, arguing: (1) the State failed to prove that the defendant's waiver of his rights and confession were voluntary because his desire to alleviate his harsh living conditions at the prison influenced his decision to confess; (2) the defendant's waiver of his right to counsel was insufficient because the waiver occurred without the consent or presence of counsel; and (3)

an assistant attorney general violated Rule 4.2 of the Rules of Professional Conduct by allowing a post-indictment interview of a defendant without his counsel being present. We affirm.

On August 23 and 24, 1991, Alan Fifield and Anthony Bardas, inmates of the secure housing unit of the New Hampshire State Prison, were murdered. Bardas was stabbed to death just outside of his cell, in view of at least one guard who testified that he saw the defendant and two other inmates participate in the stabbing. Immediately after the murders, the defendant and the others implicated were placed on a high security status known as "special management," which was intended for inmates who required special handling due to their highly disruptive behavior or because they posed a threat to themselves, guards, or other inmates. The superior court found that severe restrictions were initially placed upon these inmates:

> "[T]hey were completely segregated from other inmates; restricted to their individual cells for all but one hour each day; had reduced access to the dayroom on their [floor of the prison]; had reduced access to their personal hygiene items; had the use of their personal property, such as radios and reading and writing materials restricted; were subject to unscheduled and frequent cell searches and strip searches; were severely restricted with respect to the access that they had to telephone contact with their lawyers and friends and family; were confined by both hand and foot shackling during any time they spent outside their cell; were escorted by guards dressed in riot gear any time they left their cells; and were denied any access to the law library."

By the time of the defendant's confession, the conditions of his confinement had improved somewhat in that some of his personal property had been returned and he had more time out of his cell each day.

On November 27, 1991, Benjamin Robidoux, who had been indicted in the Fifield murder case and who was in special management status along with the defendant, wrote a note to department of corrections personnel expressing a desire to speak to the police concerning the homicides of both Fifield and Bardas. State Police Sergeant Kevin Babcock received the message that Robidoux wished to speak to him; he then called the attorney general's office and spoke with Assistant Attorney General Ward Scott. Scott told Babcock that any contact between the prison officials or the police and the defendants must be initiated by the defendants, any interview should be audio recorded, on the audio recording it should be made

plain that the meeting was at the request of Robidoux, Robidoux must be advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Robidoux must specifically waive his right to have his attorney present at the interview. Babcock relayed this information to the department of corrections chief investigator at the prison, Lieutenant Donald McGill.

On December 2, 1991, the defendant, who had by this time been indicted in the Bardas murder case, sent a note requesting a meeting with McGill. The next day McGill held an audio-taped meeting with the defendant at which the defendant, after being advised of his *Miranda* rights and waiving his right to have counsel present, stated that he and the other Bardas/Fifield defendants would be willing to exchange information regarding the slayings for improved living conditions. McGill made the defendant no promises but stated he would check into the possibility of a deal. After the meeting McGill spoke with Babcock, who spoke with the attorney general's office and was told that there would be no deals made for confessions. McGill relayed this information to the defendant.

Despite knowing that no deals would be made, the defendant sent another note to McGill on December 5, 1991, requesting a meeting. In response to that request, McGill held a video- and audio-taped meeting with the defendant. The defendant was advised of his *Miranda* rights, which he acknowledged understanding and waived. He also stated that although he had an attorney, he did not want his attorney present. He admitted that he had been made no promises or deals, and that he knew the prosecution had a strong case against him. He also stated that he was confessing to set the record straight and to clear up lies that he perceived in the various police reports and witness statements. He then confessed, in detail, to his participation in both the Fifield and Bardas slayings.

Before the defendant's trial began, his counsel moved to suppress the confession on the grounds that it was not voluntary, given the defendant's living conditions, and that it had been taken in violation of the defendant's right to counsel. The trial court denied the motion, finding that while the defendant's living conditions were severe, the conditions were not in fact the cause of the defendant's decision to confess, and moreover the conditions had improved markedly from what they were immediately after the murders. The trial court therefore found, beyond a reasonable doubt, that the confessions were voluntary. The trial court also found that the defendant had voluntarily waived his right to have his attorney present at the confession interview.

■ The defendant contends on appeal that his waiver of counsel and confession were involuntary because they were induced by the stress and anxiety of three months' confinement in special management status and by an implied promise of improved living conditions. Because the State Constitution provides at least as much protection to the defendant's individual liberties in this context as does the Federal Constitution, we will address the claims under the State Constitution first and look to the decisions of the federal courts only for guidance. *See State v. Chapman*, 135 N.H. 390, 394, 605 A.2d 1055, 1058 (1992).

■ The voluntariness of a confession is initially a question of fact for the trial court, whose decision will not be overturned unless it is contrary to the manifest weight of the evidence, as viewed in the light most favorable to the State. *Id.* at 399, 605 A.2d at 1061. In order to be considered voluntary, a confession must be the product of an essentially free and unconstrained choice and not extracted by threats, violence, direct or implied promises of any sort, or by the exertion of any improper influence. *Id.* The State must prove voluntariness beyond a reasonable doubt. *Id.* at 398, 605 A.2d at 1060. In order for a waiver of the right to counsel to be considered voluntary, the defendant must know of his right to have his counsel present, understand the consequences of waiving that right, and choose to waive the right without any inducement by the government. *State v. Scarborough*, 124 N.H. 363, 369, 470 A.2d 909, 914 (1983). In making its determinations, the trial court must consider the "totality of the surrounding circumstances." *Chapman*, 135 N.H. at 399, 605 A.2d at 1061; *see Scarborough*, 124 N.H. at 369, 470 A.2d at 914–15.

■ The trial court heard six days of testimony about the defendant's conditions of confinement and viewed the defendant's living quarters at the prison. It also watched the video tape of the defendant's confession in which the defendant acknowledged that no promises were made to him for a confession, recognized his right to have his attorney present, and waived that right. The tape also shows that the defendant was calm, and was in fact in control of the interview. The defendant was not interrogated, but rather narrated his version of the story in his own words and with numerous uninterrupted tangents. In its order, the court recognized that the defendant's living conditions were harsh, and that under the law if the court found these conditions to have overborne the defendant's will, his confession would have to be suppressed. *See State v. McVay*, 237 Ariz. 18, 21, 617 P.2d 1134, 1137 (1980). The court found, however, that the

"defendants' confessions in December, 1991, were not given as a result of stress which was caused by the conditions of their confinement. . . . The confessions did not come as a result of one or more of the defendants simply "losing it" and screaming through the bars of their cells. Quite the contrary, they came after a period of negotiation that lasted over a week, from November 27, 1991, through December 5, 1991. The defendants were very careful throughout this period not to incriminate themselves until they wanted to."

The trial court further found the defendant's argument, that there had been inducements offered by the State, generally of improved living conditions, was unfounded; on the contrary, the only evidence as to inducements was Sergeant McGill's testimony that the defendant had been told clearly that no deals would be made for confessions. The trial court thus found, given the totality of the circumstances, that the defendant's confession and waiver of his right to counsel were voluntary beyond a reasonable doubt. We find these determinations to be supported by the record.

We also reject the defendant's argument that a promise of improved living conditions in exchange for a confession was implied by the very fact of the harsh conditions. The defendant may well have hoped to improve his lot through confessing; however, a hope on the defendant's part does not rise to the level of an implied promise. *See United States v. Hawkins*, 823 F.2d 1020, 1023 (7th Cir. 1987) (defendant's mistaken belief that he would receive lenient treatment did not cause his confession to be involuntary).

█ The defendant also argues that his waiver of his right to have counsel present at his confession was insufficient under the State Constitution because his counsel was not present for and did not consent to the interview. We have previously declined to adopt a *per se* rule under our State Constitution that "once an individual is represented by counsel on the matter on which the State seeks to question [him or] her, no waiver of counsel is valid unless made in the presence of counsel." *State v. Smart*, 136 N.H. 639, 664, 622 A.2d 1197, 1213, *cert. denied*, 114 S. Ct. 309 (1993); *State v. Lamb*, 125 N.H. 495, 496, 484 A.2d 1074, 1075 (1984). We note that both *Smart* and *Lamb* addressed this issue under the State Constitution in the pre-indictment context. *Smart*, 136 N.H. at 664, 622 A.2d at 1213; *Lamb*, 125 N.H. at 496, 484 A.2d at 1075. *Scarborough*, which addressed this issue in the post-indictment context, cited the State Constitution and analyzed the issue on federal constitutional grounds. *Scarborough*, 124 N.H. at 370, 470 A.2d at 914. The defend-

ant here argues that our State Constitution should provide greater protection than does the Federal Constitution in the post-indictment context. We continue to find the argument for a *per se* rule unpersuasive. Nor do we agree with the defendant that his case may be distinguished from *Scarborough* based upon the fact that the defendant in this case was in custody and thus limited in his ability to contact his attorney. *See Scarborough*, 124 N.H. at 366–67, 470 A.2d at 912 (defendant's confession given after arraignment, but while he was free on bail). The defendant was reminded of his right to have his counsel present, and was reminded that his statements would be used against him at his trial. The defendant was made aware of his rights and of their importance to him; he thus had sufficient information to waive his right to have his counsel present at the interview. *See Scarborough*, 124 N.H. at 369, 470 A.2d at 914; *see also Patterson v. Illinois*, 487 U.S. 285, 292–94 (1988).

The defendant lastly argues that in advising the police regarding the way in which an in-custody interview could be taken, the attorney general's office violated Rule 4.2 of the Rules of Professional Conduct, and that this violation warrants the suppression of his confession. Rule 4.2 provides:

> "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

As the defendant argues, we left unanswered the issue of a remedy for a violation in *Smart*, 136 N.H. 639, 622 A.2d 1197, where we found that a non-custodial and pre-indictment conversation recorded by an agent of the attorney general did not implicate the Rule. *Id.* at 664–66, 622 A.2d at 1213–14. Here we address that issue directly. We need not determine whether an ethical violation occurred, because we hold that suppression of a confession is not warranted absent a violation of the defendant's constitutional or statutory rights.

The New Hampshire Rules of Professional Conduct are aimed at policing the conduct of attorneys, not at creating substantive rights on behalf of third parties. *See* N.H. R. PROF. CONDUCT Scope at 4 ("The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. . . . [V]iolation of a Rule should not itself give rise to a cause of action nor should it create any presumption that an independent legal duty has been breached."). We agree with the reason-

ing of the majority of the Michigan Supreme Court in *People v. Green*, 405 Mich. 273, 274 N.W.2d 448 (1979):

> "This argument [that suppression is the proper remedy for a violation of an analogous professional conduct rule] rests upon a basic misconception of the Code of Professional Responsibility. The provisions of the code are not constitutional or statutory rights guaranteed to individual persons. They are instead self-imposed internal regulations prescribing the standards of conduct for members of the bar. Although it is true that the principal purpose of many provisions is the protection of the public, the remedy for a violation has traditionally been internal bar disciplinary actions against the offending attorney. The sanctions available are by no means trivial. The attorney faces permanent disbarment. In these respects the provisions of the code are no different from the provisions found in the codes of conduct for other professions, such as medicine or architecture. They are all self-governing in-house regulations.
>
> The admissibility of evidence in a court of law, on the other hand, is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines. Codes of professional conduct play no part in such decisions."

*Id.* at 293–94, 274 N.W.2d at 454; *see Suarez v. State*, 481 So. 2d 1201, 1207 (Fla. 1985), *cert. denied*, 476 U.S. 1178 (1986); *State v. Morgan*, 231 Kan. 472, 478–79, 646 P.2d 1064, 1070 (1982); *State v. McCoy*, 618 A.2d 384, 387 (N.J. Super. Ct. Law Div. 1992); *State v. Ford*, 793 P.2d 397, 399–400 (Utah Ct. App. 1990); *cf. United States v. Henry*, 447 U.S. 264, 275 n.14 (1980) (analogous professional conduct rule does not bear on the issue of whether defendant's sixth amendment right to counsel was violated); *United States v. Crook*, 502 F.2d 1378, 1380–81 (3d Cir. 1974) (federal statute requiring trial judge to admit into evidence statement made voluntarily controls over provisions of Code of Professional Responsibility); *State v. Norgaard*, 201 Mont. 165, 174, 653 P.2d 483, 487 (1982) (notes in dicta that the bar association rules play no part in evidentiary rulings). *But see United States v. Hammad*, 858 F.2d 834, 842 (2d Cir. 1988), *cert. denied*, 498 U.S. 871 (1990). Accordingly, we hold that the defendant has no remedy under the Rules of Professional Conduct.

*Affirmed.*

All concurred.