Hillsborough-southern judicial district
No. 93-659

THE STATE OF NEW HAMPSHIRE

v.

EDUARDO LOPEZ, JR.

December 30, 1994

*Jeffrey R. Howard*, attorney general (*Ann M. Rice*, assistant attorney general, on the brief, and *Michael D. Ramsdell*, senior assistant attorney general, orally), for the State.

*Albert E. Scherr*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J. The defendant, Eduardo Lopez, Jr., was convicted of first degree murder, RSA 630:1-a (1986), first degree assault, RSA

631:1 (1986 & Supp. 1993), attempted first degree assault, RSA 629:1 (1986); RSA 631:1, and robbery, RSA 636:1 (1986 & Supp. 1993). He appeals the Superior Court's (*Murphy*, J.) denial of his motion to suppress a statement he made to a police officer. At issue is the federally recognized public safety exception to the rule of *Miranda v. Arizona*, 384 U.S. 436 (1966). We affirm.

The relevant facts are not in dispute. On March 23, 1991, at approximately 9:00 p.m., a young man approached Roscoe Powers on a Main Street sidewalk in Nashua. The man pointed a gun at Powers and asked him for money. Powers turned and ran, and the man chased after him, catching up with him as Powers slipped on the ice. The man shot Powers in the chest. Powers managed to keep moving, and his assailant continued to pursue him. Finally, when Powers drew a knife and turned to confront the man, he was gone. Powers survived the assault.

Less than an hour later, on nearby West Pearl Street, a young man approached Robbie Goyette and a friend as they sat in a car. The man pointed a gun and asked the two for money. Goyette refused and drove off. The man ran alongside the car and shot Goyette in the neck, killing him.

Thomas MacLeod, a Nashua police officer, was on duty that night and learned of the shootings. At around 10:00 p.m., a sergeant ordered him to search for possible suspects, giving him a description from witnesses to the shootings. MacLeod combed the neighborhood without success but then heard a loud scream coming from a building on Spring Street, approximately two blocks away from the shootings. As he neared the building's entrance, Eduardo Lopez emerged from the doorway and walked toward him. Lopez fit the description MacLeod had been given and was carrying a three or four foot long wooden hand rail. MacLeod told him to stop, but Lopez ignored him. Thinking Lopez might be the one who shot Powers and Goyette, MacLeod drew his gun and ordered him to drop the hand rail. Lopez refused, retorting, "F___ you. I am not dropping the stick. You're going to have to shoot me." MacLeod replied that he did not want to shoot him and, holstering his gun, took some steps toward Lopez. Lopez swung the stick at MacLeod, striking his shoulder and breaking the hand rail in two. MacLeod grabbed Lopez, and the two fell to the ground, struggling.

MacLeod tried to handcuff Lopez but soon gave up. At the suppression hearing, MacLeod explained, "I felt that [Lopez] was very wir[y], he appeared to be very strong, at that time and I didn't want to have the Defendant escape . . . ." The two stood up, and MacLeod pushed Lopez against the side of the building. Lopez grabbed MacLeod's throat, making it difficult for the officer to breath. Lopez told him, "I'll f___ing kill you if you don't let me go." At this point, MacLeod noticed Lopez was wearing an empty shoulder holster. Not

knowing whether the gun used in the shootings had been recovered yet, MacLeod asked him where it was. Lopez replied, "It's upstairs." MacLeod asked Lopez no further questions and eventually succeeded in handcuffing him with the help of another officer. The gun used in the shootings was found in a nearby parking lot, but the manufacturer's box for the gun, and Lopez' fingerprints on the gun manual inside the box, were found in the building in which Lopez was first seen. These items were obtained pursuant to a search warrant.

The only issue on appeal is whether Lopez' response, "It's upstairs," should have been suppressed as inadmissible under *Miranda v. Arizona*, 384 U.S. 436. That this statement resulted from custodial interrogation without the benefit of *Miranda* warnings is not in dispute. Instead, the case turns solely on whether the statement falls within the public safety exception to *Miranda,* as recognized by the United States Supreme Court in *New York v. Quarles*, 467 U.S. 649 (1984).

On appeal, the defendant cites the State Constitution only with reference to his right to *Miranda* warnings prior to custodial interrogation. Because he makes no separate argument under the State Constitution that the public safety exception does not apply here, we decide the issue solely under the Federal Constitution.

*Miranda v. Arizona* requires exclusion at trial of a defendant's responses to custodial interrogation if the questioning is not preceded by adequate safeguards, such as the familiar *Miranda* warnings, that protect the defendant's right against self-incrimination. *Miranda*, 384 U.S. at 478–79. *New York v. Quarles* created the public safety exception to the general *Miranda* rule. *Quarles*, 467 U.S. at 655–56. In *Quarles*, a woman told two police officers that a man had just raped her at gun point and then entered a nearby supermarket. *Id.* at 651–52. One officer entered the store and spotted defendant Quarles, who matched the description given by the woman. The officer chased Quarles, losing sight of him for a few moments before catching him. *Id.* at 652. The officer frisked Quarles and discovered an empty shoulder harness; the officer handcuffed Quarles and asked him where the gun was. *Id.* Surrounded by four policemen, Quarles indicated a pile of empty cartons and answered, "[T]he gun is over there." *Id.* The weapon was recovered from one of the cartons. *Id.*

Acknowledging Quarles' response to be a product of custodial interrogation, the Court held that "on these facts there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved." *Id.* at 655–56. The Court noted, "So long as the gun was concealed somewhere in the supermarket, with its

actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." *Id.* at 657. The Court opined that "police officers can and will distinguish almost instinctively between questions necessary to secure [a police officer's] own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 658–59; *see id.* at 659 n.8.

Following *Quarles*, we have no difficulty in applying the federal public safety exception to this case. At the time Officer MacLeod asked Lopez where the gun was, MacLeod reasonably believed that Lopez had just committed two ruthless assaults. Based on this belief, and MacLeod's own perceptions of the man, it was objectively clear that Lopez was strong-willed, physically unmanageable, and a serious danger to the officer and the public. *Cf. id.* at 656 (objective test used to judge circumstances). MacLeod could reasonably view Lopez as a violent and truly dangerous man.

When MacLeod saw the empty shoulder holster, the peril to public safety was obvious. MacLeod could barely restrain Lopez. Hence, there was an alarming risk that Lopez might regain control of the gun, harm the officer, escape, and commit other brutal crimes. MacLeod also did not know whether Lopez had been working alone or with an unseen accomplice who still had access to the weapon. *Cf. Hill v. State*, 598 A.2d 784, 785 (Md. Ct. Spec. App. 1991) (officers asked defendant where other suspects and weapons could be found). Finally, as in *Quarles*, the missing gun posed a serious hazard to the general public. *See Quarles*, 467 U.S. at 657; *see also State ex rel. A.S.*, 548 A.2d 202, 205–06 (N.J. Super. Ct. App. Div. 1988); *Commonwealth v. Bowers*, 583 A.2d 1165, 1171 (Pa. Super. Ct. 1990), *appeal denied*, 598 A.2d 281 (Pa. 1991). The crimes occurred on a Saturday night in downtown Nashua, and MacLeod encountered Lopez just two blocks away. MacLeod's question about the gun's location was necessary to secure the safety of the public. *See Quarles*, 467 U.S. at 659. We note that MacLeod made no inquiries regarding the crimes or Lopez' role in them, instead asking only this one, essential question. Thus, we can say that it was not designed solely to elicit testimonial evidence. *See id.*

Lopez suggests that his response to MacLeod indicated that the gun was out of harm's way. While this may be true, the focus of our inquiry is on the objective necessity of an officer's interrogation *at the time it is made.* MacLeod could not know the answer Lopez would give him. Moreover, the gun's actual location in the middle of a nearby parking lot evidences the kind of danger MacLeod could reasonably have feared. *Cf. State ex rel. A.S.*, 548 A.2d at 206. Anyone, including teen-aged children out for the evening, could have stumbled upon it, with perilous consequences. *Cf. Bowers*, 583 A.2d at 1171.

We conclude that the federal public safety exception to *Miranda* applies here. Accordingly, under *Quarles*, the superior court did not err in admitting Lopez' statement, "It's upstairs," at trial.

*Affirmed.*

All concurred.