Hillsborough-southern judicial district
No. 96-139

THE STATE OF NEW HAMPSHIRE

v.

MICHAEL MONROE

June 11, 1998

*Philip T. McLaughlin*, attorney general (*Mark D. Attorri*, senior assistant attorney general, and *John P. Kacavas*, assistant attorney general, on the brief, and *Mr. Kacavas* orally), for the State.

*James E. Duggan*, chief appellate defender, of Concord, by brief and orally, for the defendant.

BRODERICK, J. The defendant, Michael Monroe, was convicted of second degree murder. *See* RSA 630:1-b (1996). On appeal, he argues that the Superior Court (*Hampsey*, J.) erred by: (1) admitting his involuntary confessions; (2) admitting statements, including confessions, he made without fresh *Miranda* warnings following a polygraph examination; (3) excluding evidence of his son's prior bad acts; (4) admitting hearsay testimony from the lead investigator; and (5) denying requested funds for an expert witness to testify regarding false confessions. We affirm.

On the night of March 6, 1993, Theresa Levesque, the defendant's mother-in-law, was stabbed to death in her Nashua home. Her body lay undiscovered until the following morning. That day, the Nashua Police Department began its investigation by interviewing several of the victim's relatives, including the defendant.

During the following eighteen months, the police continued to investigate the crime. Their investigation included the use of an undercover officer, "Nick," to portray a witness who saw the

defendant leaving the victim's home. They also conducted two polygraph examinations of the defendant and interviewed him more than a dozen times. Finally, on the night of August 29, 1994, the defendant confessed. In total, he provided four confessions to the police. Following a jury trial, the defendant was convicted of second degree murder. This appeal followed.

I

The defendant first argues that his confessions were involuntary because they were coerced by improper police tactics, including threats of violence and extortion. The nature of the defendant's challenge compels a detailed review of the evidence in the light most favorable to the State. See State v. Aubuchont, 141 N.H. 206, 209, 679 A.2d 1147, 1149 (1996).

When police suspicion of the defendant as a potential suspect intensified, they used an undercover officer, Nick, to portray a witness who saw the defendant leaving the victim's home on the night of the murder. Nick had three direct contacts with the defendant, twice over the phone and once in person. He also left messages at the defendant's restaurant on two occasions, knowing that the defendant was at the police station.

The two telephone conversations occurred in March 1993. In sum, Nick related that he and his girlfriend had spotted the defendant at the victim's home on the evening of the murder and that in exchange for money, he would not tell the police.

Both calls were promptly reported to the police, who then interviewed the defendant. In both interviews, the defendant revealed only portions of the calls, such as Nick's demand for $2,000, and denied that they concerned his mother-in-law's death. Also, during an interview unrelated to Nick's calls, the detectives alleged that an anonymous woman had called the station, claiming that she had some information concerning the victim's death and that she disagreed with some actions taken by her boyfriend, whom she did not identify. The defendant refuted any connection between that call and his encounters with Nick.

On the night of April 9, 1993, Nick approached the defendant in the alley behind his restaurant. He demanded $2,000, but the defendant again denied that he was at the victim's home on the night of the murder and told Nick that he had passed a polygraph examination with "flying colors."

Nick, however, insisted that he saw the defendant at the victim's house, and asked him if he would "risk going down for this rather

than giving [him] a little money [to] get [him] out of [his] life?" The defendant told Nick that the police knew about him. Nick, in turn, suggested that they call the police together, a suggestion the defendant rebuffed. The next day, the defendant returned to the police station and told the detectives about his encounter with Nick, but, again, failed to disclose Nick's assertion that he saw him at the victim's house on the night of the crime. Rather, he told the police that Nick gave no reason for his demand.

On April 22, 1994, more than one year after the defendant's last interview with the police and following his relocation to North Carolina, Detectives Douglas Hayes and James Briggs of the Nashua police and a local police detective appeared at the restaurant where the defendant was working. The defendant told the detectives that, on the advice of his attorney, he would not go to the police station. He eventually agreed, however, to talk to them in the back of the restaurant. Detective Hayes told the defendant that Nick had implicated him in the victim's death and confessed to demanding money in exchange for not reporting what he knew to the police. In response, the defendant denied ever discussing the murder with Nick.

Shortly thereafter, Detective Hayes went to see the defendant's wife, Rosemarie, and told her that the police had found Nick and that he had provided them with information about the homicide. He also told her that Nick's explanation for his calls to the defendant differed from that provided by her husband, and he suggested that she ask her husband for the substance of Nick's explanation. When asked, however, the defendant advised Rosemarie that he did not know what information Nick had given to the police. After further prompting by the police, Rosemarie again inquired, but the defendant remained firm that Detective Hayes had not given him any additional information about Nick.

After several additional months without police contact, the defendant was visited at his home by Detectives Hayes and Seusing on the morning of August 28, and he agreed to an interview. Along with Rosemarie, the detectives confronted him with the discrepancies between his conversations with his wife and his conversations with the police. The interview maintained a conversational tone, and after three hours, Rosemarie asked the defendant to take a polygraph examination, and he agreed.

The following afternoon, at approximately 4:30 p.m., the defendant and his wife arrived at the North Carolina State Bureau of Investigation for the examination. Detectives Seusing and Hayes introduced the defendant to Special Agent Johnson, who adminis-

tered the polygraph after the defendant reviewed his *Miranda* rights and signed a waiver.

Following the examination, Johnson concluded that the defendant was deceptive when he denied stabbing the victim. As a result, at approximately 7:30 p.m., he began calmly questioning the defendant and encouraging him to admit to the killing. Shortly before nine o'clock, he brought Rosemarie into the interview room at the defendant's request. The defendant became increasingly emotional and stated that he could not remember being involved, but he no longer denied involvement.

Approximately one hour later, Detective Seusing replaced Agent Johnson. He and Rosemarie began asking questions and confronting the defendant with their belief that he was responsible for the murder. Detective Seusing maintained a conversational tone, with only the defendant and his wife expressing emotion. By 10:30 p.m., the defendant admitted that he had argued with the victim at her house during the night of the murder and, after gradually revealing more details, confessed to the stabbing. After providing some additional details, the defendant informed the detective that he was thirsty. Detective Seusing got soft drinks for the defendant and his wife, and they took a break from questioning.

When they reconvened, the defendant provided a more detailed confession, including a description of the events leading up to his arrival at the victim's home and the nature of their argument. The defendant then asked to smoke a cigarette and was brought to a smoking room. The detective offered him food, which he declined.

Close to midnight, the defendant agreed to have further discussion recorded. On tape, the defendant stated that he had taken the polygraph examination freely and, after the detective reminded him that he did not have to continue with the interview, agreed to further questioning. He then confessed again. At 1:20 a.m., on August 30, the police arrested the defendant for murder.

While en route to New Hampshire on August 31, the defendant executed another waiver of his *Miranda* rights. Almost immediately upon his return to Nashua, he confessed again and led the police through a reenactment of the events of March 6, 1993, including the murder.

## A

█ The trial court found beyond a reasonable doubt that the defendant's confessions were voluntary. *See State v. Beland*, 138 N.H. 735, 737, 645 A.2d 79, 80 (1994). "We will not overturn the trial

court's decision unless it is contrary to the manifest weight of the evidence . . . ." *Aubuchont*, 141 N.H. at 209, 679 A.2d at 1149 (quotation omitted). "Because the State Constitution provides greater protection to a criminal defendant with respect to confessions than does the Federal Constitution, we decide this case under the State Constitution with reference to federal cases only to aid our analysis." *Id.* at 208, 679 A.2d at 1148-49 (quotation and ellipsis omitted); *see Beland*, 138 N.H. at 737, 645 A.2d at 80 (noting that State Constitution requires proof beyond reasonable doubt while Federal Constitution requires only preponderance of the evidence).

"[T]o be considered voluntary, a confession must be the product of an essentially free and unconstrained choice and not extracted by threats, violence, direct or implied promises of any sort, or by the exertion of any improper influence." *State v. Decker*, 138 N.H. 432, 436, 641 A.2d 226, 228 (1994). "In determining the voluntariness of the confession, the trial court must examine the totality of the surrounding circumstances." *Beland*, 138 N.H. at 737, 645 A.2d at 80. "[B]oth the characteristics of the accused and the details of the interrogation" are considered. *State v. Damiano*, 124 N.H. 742, 747, 474 A.2d 1045, 1048 (1984) (quotation omitted). "The court should look at the factual circumstances surrounding the [confession], the psychological impact on the defendant, and the legal significance of how the defendant reacted, in order to determine whether the police exerted such an influence on the defendant that his will was overborne." *State v. Wood*, 128 N.H. 739, 742, 519 A.2d 277, 279 (1986).

■ We first address the defendant's argument that Nick, the undercover officer, by his tone of voice, appearance, character, and message, presented a credible threat of violence or extortion. Assuming, without deciding, that such a threat existed while the defendant resided in New Hampshire, it did not induce the defendant to confess. *See State v. Carroll*, 138 N.H. 687, 692-93, 645 A.2d 82, 85 (1994); *Decker*, 138 N.H. at 436-37, 641 A.2d at 228-29 (conditions must have overborne defendant's will for confession to be involuntary). Several months before he confessed, the defendant knew that Nick was in police custody and had told the police that he saw the defendant at the victim's home on the night of the murder. Consequently, when he confessed, Nick posed no threat of violence or extortion to the defendant and, accordingly, did not cause his will to be overborne.

■ The evidence also shows that Nick's portrayal of a witness did not trick or coerce the defendant into confessing. *Cf. Decker*, 138

N.H. at 436-37, 641 A.2d at 229. The defendant spoke with Nick three times, twice over the phone and once in person. He promptly reported each encounter to the police but intentionally omitted Nick's claim that he saw the defendant at the victim's house on the evening of the murder. The defendant repeatedly denied any involvement in the crime. *See State v. Amaya-Ruiz*, 800 P.2d 1260, 1273 (Ariz. 1990), *cert. denied*, 500 U.S. 929 (1991); *Beasley v. United States*, 512 A.2d 1007, 1016 (D.C. 1986), *cert. denied*, 482 U.S. 907 (1987). In fact, the defendant never revealed Nick's incriminating claims to his wife. The defendant's restraint in these instances supports the trial court's determination that his encounters with Nick did not play any meaningful part in his decision to confess. *See Decker*, 138 N.H. at 436-37, 641 A.2d at 229; *cf. Edwards v. State*, 412 N.E.2d 223, 227 (Ind. 1980).

Moreover, during the interview session prior to the defendant's first confession, Nick was never mentioned. In fact, Nick's "eyewitness accounts" were never discussed during any interrogation in which the defendant confessed. Consequently, Nick's role early in the investigation did not coerce the defendant into confessing. *See Carroll*, 138 N.H. at 692-93, 645 A.2d at 85-86; *Decker*, 138 N.H. at 436-37, 641 A.2d at 229; *Beasley*, 512 A.2d at 1015-16.

## B

The defendant also argues that the length, number, and manner of the interrogations undercut his will and eventually compelled his confessions. Although the defendant underwent several interviews in New Hampshire within the weeks following the murder, none occurred for more than a year prior to the April 22, 1994, interview in North Carolina. After that interview, the police did not meet with the defendant again for four months. Accordingly, we focus our attention on the interview sessions just prior to the defendant's first confession.

The police interviewed the defendant twice in August 1994. He willingly consented to a polygraph examination. *See People v. Thomas*, 561 N.E.2d 57, 62-63 (Ill. 1990), *cert. denied*, 498 U.S. 1127 (1991); *cf. State v. Baillargeon*, 124 N.H. 355, 361, 470 A.2d 915, 919 (1983). Detectives with whom the defendant was familiar were present at both interviews and gave him appropriate *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436 (1966), with which he had become familiar during previous questioning. *See State v. Copeland*, 124 N.H. 90, 93, 467 A.2d 238, 240 (1983); *United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir. 1987), *cert. denied*, 488 U.S.

983 (1988); *see also Berkemer v. McCarty*, 468 U.S. 420, 433 n.20
(1984) ("[C]ases in which a defendant can make a colorable argu-
ment that a self-incriminating statement was 'compelled' despite the
fact that the law enforcement authorities adhered to the dictates of
*Miranda* are rare."); *United States v. Washington*, 431 U.S. 181, 188
(1977). During the interview in which the defendant first confessed,
the questioning was not particularly intimidating, and the detectives
offered him breaks, food, and soft drinks. *See Carroll*, 138 N.H. at
695, 645 A.2d at 87; *Thomas*, 561 N.E.2d at 62.

■ The defendant points to the use of the polygraph results as
contributing to the totality of circumstances overbearing his will.
The use of polygraph results in questioning is not inherently
coercive, *see Wyrick v. Fields*, 459 U.S. 42, 48 (1982), but merely a
factor to be considered in examining the circumstances surrounding
a confession. The "defendant agreed to take the test [and] . . .
cannot, therefore, persuasively argue that his confession was co-
erced by a test that he voluntarily took." *Thomas*, 561 N.E.2d at 63.
Further, confronting the defendant with *actual* polygraph results
suggesting involvement in a crime cannot be claimed to have had an
undue influence on the defendant. *See Bae v. Peters*, 950 F.2d 469,
475 (7th Cir. 1991); *cf. Baillargeon*, 124 N.H. at 361, 470 A.2d at 919.

C

■ Finally, the defendant argues that his wife's statements and
presence contributed to the involuntariness of his confessions. The
defendant does not argue, however, that his wife was a state actor.
*See Carroll*, 138 N.H. at 692, 645 A.2d at 85. Where no state actor
exists, there can be no violation of a defendant's constitutional
rights. *Id.* at 691, 645 A.2d at 85. Moreover, the record does not
suggest that Rosemarie was engaged in frenzied and insistent
questioning of her husband, *see id.* at 693, 645 A.2d at 86, causing his
will to be overborne. "Even if [the defendant's] confession[s] were
an emotional response to the thought of alienating [his wife], it was
not . . . the product of coercion or other improper tactics." *Bryant
v. Vose*, 785 F.2d 364, 368 (1st Cir.), *cert. denied*, 477 U.S. 907 (1986).

In sum, regardless of whether the factors highlighted by the
defendant are considered individually or collectively, we hold that
the trial court's finding of voluntariness is not contrary to the
manifest weight of the evidence. Thus, the trial court did not err in
admitting the defendant's confessions. *See Aubuchont*, 141 N.H. at
209-10, 679 A.2d at 1149-50; *Decker*, 138 N.H. at 436-37, 641 A.2d at
228-29; *Chalan*, 812 F.2d at 1308.

## II

We next consider whether the pre-polygraph *Miranda* warning sufficiently informed the defendant of his rights concerning the post-polygraph interview. The defendant argues that the circumstances of the post-polygraph interview involved such a significant change in the character of the interrogation that a fresh *Miranda* warning was required. *See Wyrick*, 459 U.S. at 48-49; *see also State v. Torres*, 130 N.H. 340, 343, 540 A.2d 1217, 1220 (1988). Specifically, he asserts that his interrogation became custodial and more coercive, noting the change of interrogators from Agent Johnson to Detective Seusing and Rosemarie as the turning point.

■ ■ The defendant also argues that he was entitled to fresh *Miranda* warnings because the waiver form he signed referenced only questioning by the North Carolina Bureau of Investigation. The defendant, however, failed to preserve any issue regarding the scope of his waiver in his notice of appeal; therefore, this argument is waived. *See* SUP. CT. R. 16(3)(b); *State v. Burr*, 142 N.H. 89, 91-92, 696 A.2d 1114, 1116 (1997). Turning to the merits of the defendant's other arguments, we consider the evidence in the light most favorable to the State. *State v. Gagnon*, 139 N.H. 175, 177, 651 A.2d 5, 7 (1994).

During the preliminary investigation in New Hampshire in March 1993, the defendant took a polygraph examination for which he signed a *Miranda* waiver form. Sergeant David Crawford conducted the interview and concluded that the defendant was deceptive when he denied killing the victim. At the conclusion of the examination, the defendant signed another *Miranda* waiver, and Detectives Seusing and Scaccia interviewed him.

As discussed above, before he confessed in North Carolina in August 1994, the defendant received another polygraph examination. Prior to the examination, the defendant read a *Miranda* warning. Agent Johnson then reviewed the waiver form with the defendant paragraph by paragraph, asking him if he understood. He replied affirmatively after each paragraph was read. The defendant argues, however, that when he later was questioned by Detective Seusing and Rosemarie, his interrogation became custodial, entitling him to a fresh *Miranda* warning prior to his confession.

To introduce statements made by a defendant during a custodial interrogation, "the State must prove beyond a reasonable doubt that the defendant knowingly, intelligently and voluntarily waived his constitutional rights." *Id.* (quotation omitted). We will not reverse

the trial court's finding on this issue "unless the manifest weight of the evidence, when viewed in the light most favorable to the State, is to the contrary." *Id.* (quotation omitted). We address the defendant's claim under the State Constitution, referring to federal authority only to assist our analysis. *State v. Johnson*, 140 N.H. 573, 577, 669 A.2d 222, 226 (1995) (citation omitted). "Because federal law provides no greater protection to the defendant in this area, we do not address separately his claim under the Federal Constitution." *Id.* (citations omitted).

 "*Miranda v. Arizona* requires exclusion at trial of a defendant's responses to custodial interrogation if the questioning is not preceded by adequate safeguards, such as the familiar *Miranda* warnings, that protect [a] defendant's right against self-incrimination." *State v. Lopez*, 139 N.H. 309, 311, 652 A.2d 696, 698 (1994). Although a defendant not previously warned must receive a *Miranda* warning when he is confronted with a custodial interrogation, *see, e.g., State v. Dellorfano*, 128 N.H. 628, 633, 517 A.2d 1163, 1166 (1986), if he is warned prior to this moment, the Constitution does not mandate that he be warned again when the custodial interrogation actually begins. *Cf. Torres*, 130 N.H. at 344, 540 A.2d at 1219. Once a defendant has made a knowing, intelligent, and voluntary waiver, there is no *per se* requirement to remind him of his rights continually. *See Com. v. Mello*, 649 N.E.2d 1106, 1114 (Mass. 1995); *see also Torres*, 130 N.H. at 344, 540 A.2d at 1219. Rather, the need for an additional warning is determined by the totality of the circumstances. *See, e.g., Torres*, 130 N.H. at 344, 540 A.2d at 1220 (lapse of time between original warnings and questioning rendered waiver invalid); *State v. Burge*, 487 A.2d 532, 543 (Conn. 1985) (mental condition did not affect memory or faculties and render earlier warnings invalid).

 Assuming, without deciding, that the defendant was in custody when Detective Seusing replaced Agent Johnson and began questioning him, *see State v. Carpentier*, 132 N.H. 123, 126-27, 562 A.2d 181, 183 (1989), we hold that the pre-polygraph *Miranda* warning provided the defendant with sufficient safeguards to protect his right against self-incrimination during the post-polygraph interview. *See Burge*, 487 A.2d at 543; *Mello*, 649 N.E.2d at 1114. Initially, the defendant had read and reviewed the *Miranda* warning with Agent Johnson, replying affirmatively when asked if he understood. The defendant was adequately warned at that time. *See Dellorfano*, 128 N.H. at 636, 517 A.2d at 1168-69.

The record supports the trial court's ruling that the defendant was not entitled to fresh warnings after the polygraph examination. *See Com. v. Edwards*, 651 N.E.2d 398, 401 (Mass. 1995); *Com. v. Alicea*, 381 N.E.2d 144, 150 (Mass. 1978). The short breaks taken during the course of the evening following the examination did not render the earlier *Miranda* waiver invalid. *See Burge*, 487 A.2d at 543; *cf. Torres*, 130 N.H. at 343-44, 540 A.2d at 1219-20. Furthermore, the duration of the evening itself did not render the initial *Miranda* warning ineffective. *See Burge*, 487 A.2d at 543 (initial *Miranda* warnings valid where four hours lapsed between warning and confession); *Mello*, 649 N.E.2d at 1114 (initial *Miranda* warnings valid where nearly six hours lapsed between warnings and second confession). Moreover, the defendant never asserted his right to silence nor did he request counsel. *See Edwards*, 651 N.E.2d at 401-02; *Mello*, 649 N.E.2d at 1114. The defendant's statements and conduct gave no indication that his comprehension and volition had been affected so as to render the warning ineffective. *See State v. Lewis*, 129 N.H. 787, 796, 533 A.2d 358, 364 (1987); *Mello*, 649 N.E.2d at 1115; *cf. Gagnon*, 139 N.H. at 178, 651 A.2d at 7 (defendant's mental and physical conditions rendered waiver invalid).

The defendant should have anticipated that he would receive post-examination interrogation. *See Wyrick*, 459 U.S. at 47 (defendant unreasonable if he assumed that he would not be asked to explain unfavorable polygraph results); Dix, *Federal Constitutional Confession Law: The 1986 and 1987 Supreme Court Terms*, 67 TEX. L. REV. 231, 243 (1988) ("The Court [] made a waiver effective as to at least some procedures that the suspect *should have* anticipated rather than limiting it to those that the suspect in fact did — reasonably or not — anticipate."). Several months earlier in New Hampshire, the defendant sat for a polygraph examination that was followed by questioning. Given his knowledge that Detective Seusing was present and the defendant's prior experience with post-polygraph interviews, the defendant should have anticipated that the detective would interview him following the examination. *Cf. Baillargeon*, 124 N.H. at 361, 470 A.2d at 919 (agreement made prior to examination as to post-polygraph questions to be asked). Likewise, the defendant's wife accompanied him to the bureau in August 1994 and had been active during the previous day's questioning at their home. Thus, the defendant should have anticipated her involvement.

Finally, the defendant argues that he was entitled to fresh *Miranda* warnings after the polygraph examination because the

interview became more coercive. He claims that his interrogators implored him to confess, rather than just confronting him with their belief that he was being deceptive. The record, however, indicates that although Detective Seusing and Rosemarie confronted the defendant with his polygraph examination results and urged him to tell the truth, they did not become significantly coercive in their questioning so as to require new *Miranda* warnings. *See Bae*, 950 F.2d at 475; (confronting defendant with actual polygraph results is not coercive); *Burge*, 487 A.2d at 543 (noting that precustodial warnings may be insufficient where the overall situation becomes *significantly* more coercive); *cf. Dellorfano*, 128 N.H. at 636, 517 A.2d at 1168 (presenting defendant with incriminating evidence not coercive). Although the defendant and his wife became emotional, the interview maintained a conversational tone throughout. *See State v. Pierce*, 130 N.H. 7, 10-11, 533 A.2d 34, 37 (1987). In addition, the detective gave the defendant multiple breaks from questioning, providing him with soda and the opportunity to smoke a cigarette. Thus, the questioning did not become so coercive that new *Miranda* warnings were required. *See Dellorfano*, 128 N.H. at 636, 517 A.2d at 1168-69.

 We note, however, that a single, pre-custodial *Miranda* warning does not suffice for unlimited inquiry, *see Mello*, 649 N.E.2d at 1114, and is insufficient where the situation becomes *significantly* more coercive, *see Burge*, 487 A.2d at 543, or, due to a significant lapse in the interrogation process, the warnings become stale. *See Torres*, 130 N.H. at 343-44, 540 A.2d at 1219-20. While caution might dictate more frequent warnings, *see Alicea*, 381 N.E.2d at 150, the trial court's decision that the initial warning was sufficient was not contrary to the manifest weight of the evidence. *See Mello*, 649 N.E.2d at 1114.

### III

The defendant next argues that the trial court erred in its ruling on his motion *in limine* to admit certain evidence. The trial court granted the motion as to his son's threats to kill the victim and his actions on the night of the murder, including drug use. It, however, denied the motion as to evidence of prior bad acts by his son, Marc.

The defendant sought to show that Marc had a motive to kill the victim by presenting evidence of his past drug use and thefts from the victim to support his drug habit. The defendant theorized that because Marc stole from his grandmother on several prior occasions to support his drug habit, on the night of the murder he was

attempting to steal again when she interrupted his theft and he killed her. The trial court, however, ruled that Marc's drug use and thefts were irrelevant and thus inadmissible under New Hampshire Rule of Evidence 404(b).

"The decision to admit 'bad acts' evidence lies within the trial court's sound discretion and will be overturned only if the defendant can show that the decision was clearly untenable or unreasonable to the prejudice of his case." *State v. Haley*, 141 N.H. 541, 546, 689 A.2d 671, 675 (1997) (quotation and brackets omitted); *see State v. Roberts*, 136 N.H. 731, 746, 622 A.2d 1225, 1236 (1993). We hold that the trial court's decision did not constitute an abuse of discretion.

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b) typically arises where the State seeks to introduce evidence of prior bad acts of a defendant, rather than those of a witness. *See, e.g., State v. Kirsch*, 139 N.H. 647, 652-53, 662 A.2d 937, 941-42 (1995). In such cases, "[e]vidence of other bad acts is only admissible if relevant for a purpose other than to prove the defendant's character or disposition, if there is clear proof that the defendant committed the other acts, and if the prejudice to the defendant does not substantially outweigh the probative value of the evidence." *Id.* at 653, 662 A.2d at 942.

Here, the defendant sought to introduce evidence of his son's prior bad acts. There is a conflict among jurisdictions as to whether the weighing of prejudice should be made in regard to the defendant or to the third party who is being impugned by the proffer. *See, e.g., United States v. Aboumoussallem*, 726 F.2d 906, 911-12 (2d Cir. 1984) (prior bad acts of third parties likely admissible if relevant because of minimal prejudice to defendant). Nevertheless, because we hold that the trial court did not abuse its discretion in excluding the evidence as irrelevant, we need not reach the issue of which party we should consider when balancing prejudice.

To meet the relevancy requirement of Rule 404(b), "there must be a clear connection between the particular evidentiary purpose . . . and the other bad acts." *Kirsch*, 139 N.H. at 654, 662 A.2d at 942 (brackets and quotation omitted). The defendant first

argues that Marc's drug use motivated him to kill his grandmother. Motive has been defined as "supplying the reason that nudges the will and prods the mind to indulge the criminal intent." *State v. Bassett*, 139 N.H. 493, 497, 659 A.2d 891, 895 (1995) (quotation omitted). Evidence of Marc's past drug use alone is irrelevant to showing Marc's motive to murder. *See State v. Coleman*, 389 S.E.2d 659, 660-61 (S.C. 1990). The defendant fails to establish a sufficient nexus between Marc's use of drugs and a motive to murder his grandmother. Consequently, evidence of drug use would only serve as evidence of Marc's character or disposition, which is forbidden by Rule 404(b).

 The defendant also argues that Marc's past acts of stealing from the victim to support his drug habit should have been admitted to show Marc's motive to murder the victim. The defendant's theory that Marc's grandmother interrupted his stealing from her on the night of the murder lacks any evidentiary support. Because the defendant does not offer evidence of a nexus between Marc's prior thefts and the murder, and the defendant concedes that no physical evidence connected his son to the crime scene, we hold that the trial court did not abuse its discretion by excluding evidence of Marc's past acts of stealing from the victim. *See Bassett*, 139 N.H. at 499, 659 A.2d at 895-96; *State v. Smith*, 424 S.E.2d 496, 498 (S.C. 1992); *cf. People v. Whalen*, 634 N.E.2d 725, 732 (Ill. 1994) (evidence of subsequent drug purchase and use relevant to show motive for robbery-murder); *State v. Adams*, 470 S.E.2d 366, 369-70 (S.C. 1996) (defendant's drug use admissible because evidence established nexus between drug use and robbery).

## IV

The defendant next argues that the trial court erred in permitting the lead police investigator to summarize hearsay contained in police reports, opine that the defendant was a "liar," and assert that two other suspects were not involved in the murder. We agree with the State that even if it were error to permit the testimony, the error was harmless beyond a reasonable doubt. *See State v. Hennessey*, 142 N.H. 149, 157-58, 697 A.2d 930, 936 (1997).

 We determine the effect of an error by assessing "whether it can be said beyond a reasonable doubt that the inadmissible evidence did not affect the verdict." *State v. Vandebogart*, 139 N.H. 145, 157, 652 A.2d 671, 679 (1994) (quotation omitted). We evaluate the nature, quantity, and weight of the alternative evidence pre-

sented at trial and its relationship to the inadmissible evidence. *Hennessey*, 142 N.H. at 158, 697 A.2d at 936.

 The probative value and weight of the alternative evidence in this case is overwhelming. The defendant provided *four confessions*, each more detailed than the last. In the final confession, he reenacted for the police his actions leading up to and including the killing. "A confession is a special type of evidence. Its acceptance basically amounts to conviction." *State v. Phinney*, 117 N.H. 145, 147, 370 A.2d 1153, 1154 (1977); *see Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). In addition, circumstantial evidence presented at trial corroborated the defendant's confessions. *See State v. Hanley*, 116 N.H. 235, 237, 356 A.2d 687, 688 (1976).

Given the overwhelming amount of the inculpatory evidence against the defendant, the testimony at issue was inconsequential and did not affect the verdict. *See Hennessey*, 142 N.H. at 158, 697 A.2d at 937.

V

 The defendant argues that the trial court erred by denying funds for an expert witness to testify that, in certain circumstances, people falsely confess to criminal activity. *See* RSA 604-A:6 (1997). In denying the funds, the trial court concluded that the defendant failed to establish the necessity for the expert witness, and further noted his doubts as to whether the expert would provide admissible testimony. On appeal, the defendant does not challenge the trial court's ruling that the defendant failed to show the necessity for the expert services. Rather, he challenges the trial court's reasoning concerning the likelihood of admissibility of any testimony by the expert witness. Because the trial court's necessity determination provides an adequate independent ground to support its decision, we hold that the defendant has failed to show that the trial court abused its discretion. *See State v. Stow*, 136 N.H. 598, 605, 620 A.2d 1023, 1027 (1993) (abuse of discretion requires the defendant to demonstrate by clear and convincing evidence that his request included as complete a showing of necessity for the desired services as could be expected of him, and that the denial of funds substantially prejudiced him at trial).

 Those issues raised in the defendant's notice of appeal but not addressed in his brief are waived. *See State v. Colbert*, 139 N.H. 367, 370, 654 A.2d 963, 965-66 (1995). The remainder of the defendant's arguments, although properly preserved, are without

merit and do not warrant further discussion. *See, e.g., Vogel v. Vogel*, 137 N.H. 321, 322, 627 A.2d 595, 596 (1993).

*Affirmed.*

All concurred.