Monroe v. NHSP                    CV-02-069-B    11/22/02

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Michael Monroe**

    **v.**

Civil No. 02-069-B
Opinion No. 2002 DNH 209

**Jane Coplan,**
**Warden for New Hampshire**
**State Prison for Men**

### MEMORANDUM AND ORDER

Michael Monroe was convicted of second degree murder and sentenced to 40 years to life in the New Hampshire State Prison ("NHSP"). On February 6, 2002 , he filed a petition for a writ of habeas corpus in this Court, arguing that the state trial court violated his rights under the Fifth and Fourteenth Amendments by admitting into evidence a coerced and involuntary confession that he made to police without adequate <u>Miranda</u> warnings. Monroe now moves for summary judgment in his favor and issuance of the writ of habeas corpus (Doc. No. 10). Jane Coplan, Warden of NHSP, also moves for summary judgment (Doc. No. 8), arguing that Monroe's petition is without merit. For the reasons discussed below, I grant the Warden's motion.

## I.  <u>BACKGROUND</u>[1]

On the evening of March 6, 1993, Monroe's mother-in-law, Theresa Levesque, was murdered in her home in Nashua, New Hampshire.  Because there was no sign of forced entry to the home, nor any physical disturbance beyond the murder scene itself, the police investigation immediately focused on Levesque's family and friends.  Although there was no physical evidence linking Monroe to the crime, the police gradually began to suspect him due to inaccuracies in his explanation of where he was the night of the murder, as well as the fact that he was experiencing financial difficulties and would benefit from Levesque's death.

To assist in their investigation, the police arranged for an undercover officer to pose as a fictitious witness.  The officer, who identified himself only as "Nick," called Monroe on two separate occasions in March 1993, informing Monroe that both Nick and his girlfriend had seen him leaving Levesque's house on the night of the murder and would tell the police unless he paid him

---

[1]  The facts of the case are largely based upon the findings of the state court as summarized in <u>State v. Monroe</u>, 142 N.H. 857 (1998).  Certain details have been filled in by consulting the motions of the two parties.

$2,000. Monroe immediately reported these calls to the police, but informed them only of the attempted extortion, not of Nick's claims that he had seen him at the murder scene. When questioned further by the police, Monroe denied that the calls had anything to do with Levesque's murder.

On the evening of April 9, 1993, Nick came to the restaurant and approached Monroe in the alley. He again insisted that he had seen Monroe at Levesque's house and demanded $2,000 in exchange for his silence, but Monroe refused to pay. Nick tried to get Monroe to call the police with him at that time, but Monroe refused. Nick eventually left, saying that he would call again. Monroe reported this encounter to the police as well, but again told them that Nick did not explain why he was demanding the money.

Throughout March and April of 1993, Monroe was interviewed on numerous occasions by the police, including one session on March 22, when he took and failed a polygraph test. In January 1994, Monroe and his wife moved to North Carolina. In April 1994, detectives with the Nashua police arrived unannounced at Monroe's new place of employment and informed him that Nick had told the police about both Monroe's involvement in the murder and

Nick's attempts to extort money. Monroe continued to deny that he had had any involvement in Levesque's murder or that he had discussed it with Nick. The police then went to see Rose at home and gave her similar information concerning Nick. After encouragement from the police, Rose questioned Monroe about the discrepancies between his story and Nick's. Monroe, however, still insisted that he did not know what Nick had told the police.

After encouragement from Rose, Monroe agreed to another interview with the Nashua police, which took place at the Monroe residence on August 28, 1994, with Rose present. After three hours of questioning by the police, Monroe agreed to take a polygraph test. The next afternoon, at about 4:30 p.m., Monroe and Rose went to the North Carolina State Bureau of Investigation. Monroe was given a <u>Miranda</u> waiver form to read and Agent Johnson, a North Carolina state investigator, reviewed each paragraph of the waiver with Monroe. Monroe then signed the waiver and took a polygraph test administered by Agent Johnson. Agent Johnson concluded that Monroe was lying when he denied stabbing Levesque and he continued to question Monroe for an hour and a half following the polygraph test.

-4-

When Monroe continued to deny involvement in the murder, Rose was allowed to enter the room and speak with him. Rose sat with Monroe, holding his hands and encouraging him to confess while Agent Johnson continued to interrogate him. Monroe began to get emotional and said that he could not remember being involved in the murder.

An hour after Rose came into the room, Detective Seusing of the Nashua police replaced Agent Johnson. The interrogation continued until 10:30 p.m., when Monroe finally admitted to stabbing and murdering Levesque. The police took a break, and provided Monroe and Rose with soft drinks, and Detective Seusing then continued the questioning. At this time, Monroe described the events of the murder, including an argument he had had with Levesque prior to the stabbing.

At around midnight, Monroe admitted in a tape-recorded statement that he had voluntarily taken the polygraph test and that he had confessed to the murder. The police arrested him for Levesque's murder approximately one hour later. Monroe was transported to New Hampshire on August 31, 1994, and waived his Miranda rights again during the transfer. Upon his arrival in Nashua, he repeated his confession to the Nashua police and

reenacted the events of the murder for them.

Monroe later moved to suppress his confessions and the other statements he had made to the police on the grounds that he had made them involuntarily and without sufficient Miranda warnings. The New Hampshire Superior Court (Hampsey, J.) denied this motion, holding that all of Monroe's statements were voluntary, and that in each interrogation session he either had waived his Miranda rights or was not "in custody" for Miranda purposes. See Pl.'s Pet. for a Writ of Habeas Corpus (Doc. No. 1), Ex. H, Order dated Oct. 2, 1995 on Def.'s Mot. to Dismiss and to Suppress ("Suppression Order").

On November 20, 1995, a jury convicted Monroe of second degree murder. On appeal, the New Hampshire Supreme Court upheld the conviction. Monroe, 142 N.H. at 863. Deciding Monroe's claims under the New Hampshire State Constitution, the New Hampshire Supreme Court concluded that the trial court did not err in finding that Monroe's confessions were voluntary and that his Miranda rights were not violated. Id. at 863-870. Following this ruling, Monroe unsuccessfully moved for a new trial, State v. Monroe, 146 N.H. 14 (2001), and filed the habeas corpus petition which is the subject of the instant cross-motions for

summary judgment.

## II.  **STANDARD OF REVIEW**

Summary judgment may be granted on a petition for a writ of habeas corpus when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2002).  A genuine issue is one that "may reasonably be resolved in favor of either party" and therefore "properly can be resolved only by a finder of fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Material facts are those which "might affect the outcome of the suit."  Id. at 248.  Where the parties have submitted cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn."  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

A writ of habeas corpus must be denied unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States." 28 U.S.C.A. §

2254(d)(2002).[2]  "[C]learly established Federal law...refers to

the holdings, as opposed to the dicta, of [the Supreme] Court's

decisions as of the time of the relevant state-court decision."

Williams v. Taylor, 529 U.S. 362, 412 (2000).

I first determine "whether the Supreme Court has prescribed

a rule that governs the petitioner's claim" and, if so, whether

the state court acted contrary to this legal rule.  O'Brien v.

Dubois, 145 F.3d 16, 24 (1st Cir. 1998), *overruled on other

grounds by* McCambridge, 2002 WL 1941478 at *13.  The "contrary

to" prong is met if (1) "the state court arrives at a conclusion

opposite to that reached by [the Supreme] Court on a question of

law," or (2) "the state court confronts facts that are materially

indistinguishable from a relevant Supreme Court precedent and

arrives at a result opposite to [the Court's]."  Taylor, 529 U.S.

---

[2] The threshold question for a habeas petition is whether
the petitioner's federal claims were adjudicated on the merits by
the state court.  See 28 U.S.C.A. § 2254(d).  I note that
Monroe's claims were adjudicated on the merits since the New
Hampshire Supreme Court analyzed them under the New Hampshire
State Constitution, which offers equal or greater protection than
the Federal Constitution against both involuntary confessions and
Miranda violations.  Monroe, 142 N.H. at 864, 868 (citing State
v. Aubuchont, 141 N.H. 206, 208 (1996)); see McCambridge v. Hall,
No. 00-1621, 2002 WL 1941478 at *11 (1st Cir. Aug. 27, 2002).

at 405. In effect the petitioner must "show that Supreme Court precedent *requires* an outcome contrary to that reached by the relevant state court." Williams v. Matesanz, 230 F.3d 421, 425 (1st Cir. 2000), *overruled on other grounds by* McCambridge, 2002 WL 1941478 at *13, (quoting O'Brien, 145 F.3d at 24-25).

Even if the state court decision was not contrary to Supreme Court precedent, I may grant a writ of habeas corpus under the "unreasonable application" clause if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case." Taylor, 529 U.S. at 413. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at 410. There must be "some increment of incorrectness beyond error" which is sufficient for the federal court to find unreasonable in its "independent and objective judgment." McCambridge, 2002 WL 1941478 at *13, (overruling Matesanz and O'Brien to the extent that they adopted a stricter reading of the "unreasonable application" clause).

In a habeas proceeding, all factual determinations made by the state court shall be presumed to be correct, unless the

petitioner demonstrates through "clear and convincing evidence" that this presumption is erroneous. 28 U.S.C.A. § 2254(e)(1). I apply the above standard of review in my analysis.

## III. <u>DISCUSSION</u>

Monroe argues that the state court's decision to allow his confessions into evidence was "contrary to" and "an unreasonable application of clearly established federal law," because (1) the confessions were involuntary and coerced, and (2) Monroe was not given adequate <u>Miranda</u> warnings. I reject both arguments.

### A. <u>Voluntariness of Confessions</u>

Monroe argues that his confessions were involuntary because of the intimidation by the undercover officer, his wife's collaboration with the police, and the coercive nature of the interrogations themselves. I first examine whether the state court's rejection of this argument was "contrary to" Supreme Court precedent and then analyze whether it was an "unreasonable application" of such precedent.

The Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the

Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). The key question in the coercion inquiry is "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. 428, 434 (2000)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). To determine whether a defendant's will was overborne, I must consider "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." Id. (quoting Schneckloth, 412 U.S. at 226).

The state court's decision that Monroe's confessions were made voluntarily was not "contrary to" Supreme Court precedent. The state court applied governing law by looking at the "totality of the circumstances," from which it determined that Monroe's will had not been overborne by the interrogation techniques at issue. Monroe, 142 N.H. at 864. Furthermore, although Monroe notes that "precise identicality of facts and legal issues is not required" by the First Circuit, Vieux v. Pepe, 184 F.3d 59, 63 (1st Cir. 1999), he cites to no case with "materially indistinguishable" facts in which the Supreme Court found a confession to be involuntary. Taylor, 529 U.S. at 405.

-11-

Therefore, I now turn to whether the state court's finding was an "unreasonable application" of the established Supreme Court precedent. I first examine Monroe's specific claims regarding the use of Nick and Rose. Next, I analyze the "totality of the circumstances" surrounding his confession.

### 1. Police Deception Relating to "Nick"

Monroe's first argument is that the use of Nick as a fictitious witness to the murder violated his due process rights because the deception was of an unacceptable nature and duration and also because Nick posed a credible threat to Monroe and his family.

Misrepresentation to a defendant of the strength of the government's case is not *per se* coercive, although it is a factor to be considered in the "totality of the circumstances" surrounding a confession. See Frazier v. Cupp, 394 U.S. 731, 739 (1969)(rejecting the habeas petition of a defendant who confessed after being falsely informed that his co-defendant had confessed). Although the First Circuit has not specifically addressed the type of deception conducted in the present case, it has noted that "[police] trickery is not automatically coercion" and that it is common for police to falsely tell suspects that

-12-

they have physical evidence against them.  United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998)(upholding confession where police falsely told defendant that he was not a suspect). Consistent with this holding, other circuits have upheld confessions in cases where the police lied to suspects about the existence of eyewitness evidence.  See Holland v. McGinnis, 963 F.2d 1044 (7th Cir. 1992)(police falsely stated that witness saw defendant's car in alley where crime occurred); Ledbetter v. Edwards, 35 F.3d 1062 (6th Cir. 1994)(police presented defendant with fabricated fingerprint evidence implicating him in the crime and falsely told him that the victim and two other witnesses had identified him).

Although threats by an undercover officer have been found to be sufficiently coercive to require suppression of a resulting confession, see Arizona v. Fulminante, 499 U.S. 279, 287 (1991), Lam v. Kelchner, No. 00-3803, 00-4122, 2002 WL 31012990 at *5 (3rd Cir. Sept. 10, 2002), in such cases the confession was a direct result of the threatening behavior and was made to the officer immediately following the threat.  In contrast, Monroe confessed not to Nick, nor immediately following a confrontation with Nick, but rather in North Carolina several months after he

-13-

believed Nick to be in police custody in New Hampshire.  <u>Monroe</u>, 142 N.H. at 862-863.

Consequently, the New Hampshire Supreme Court found that even if Nick's behavior was threatening to Monroe, that threat "did not play any meaningful part in his decision to confess." <u>Id.</u> at 865.  Although the police confronted Monroe in North Carolina with the "evidence" obtained from Nick, he posed no apparent threat to Monroe at that time.  Indeed, the New Hampshire Supreme Court further noted that the investigators did not even mention Nick during the August 29, 1994 interrogation session.  <u>Id.</u>  In sum, while the deception was fairly long in duration, it was not unreasonable for the court to conclude that the causal connection between Nick's actions and Monroe's confession was too attenuated to amount to coercion.  <u>Cf.</u> <u>Frazier</u>, 394 U.S. at 737-738; <u>Fulminante</u>, 499 U.S. at 283.

### 2. <u>Rose's Role in Interrogation</u>

Monroe's second argument is that the use of his wife Rose during the interrogation process was coercive, comparing it to the ruses criticized in <u>Spano v. New York</u>, 360 U.S. 315 (1959) and <u>Leyra v. Denno</u>, 347 U.S. 556 (1954).

Both Spano and Leyra involved a concerted effort by police to trick the defendant into trusting someone who was actually working against him.  See Spano, 360 U.S. at 318-319; Leyra, 347 U.S. at 559-560.  In Spano, one of the defendant's close friends assisted police in the final stages of interrogation by falsely telling the defendant that an earlier confession made to the friend would get the friend and his family in trouble.  Spano, 360 U.S. at 319.  In Leyra, the police brought a psychiatrist/hypnotist into the interrogation room, had him pose as a doctor who could treat the defendant's sinus pain, and listened as he used "subtle and suggestive questions" to coax a confession out of the defendant.  Leyra, 347 U.S. 559-560.

In contrast to Spano and Leyra, the police never asked Rose to deceive Monroe, nor did she attempt to do so.  Other circuits have upheld confessions where a relative participated in the questioning process but there was no deceit or improper threatening of the defendant.  See United States v. McShane, 462 F.2d 5 (9th Cir. 1972)(defendant confessed after police brought his girlfriend to police station for questioning and to talk to defendant); United States ex rel. Church v. DeRobertis, 771 F.2d 1015 (7th Cir. 1985)(police put defendant's older brother in cell

-15-

with him, knowing that he would try to convince defendant to confess and exculpate their younger brother).  I find the reasoning of these decisions persuasive.[3]

### 3.    "<u>Totality of the Circumstances</u>"

Monroe's final argument is that the "sheer length and number of interrogation sessions" and the "various coercive techniques employed" during them made his confession involuntary.  To support this claim he points to thirteen different instances of interrogation.  However, the New Hampshire Supreme Court found that the four month gap between the initial ten interrogation sessions and Monroe's confession in North Carolina was sufficient to make the earlier sessions irrelevant.  <u>Monroe</u>, 142 N.H. at 865.  I agree with this conclusion.

---

[3] As additional support for his argument that his confession was involuntary, Monroe claims that the police violated his Fourteenth Amendment right to intimate association as articulated in <u>Roberts v. United States Jaycees</u>, 468 U.S. 609 (1984) and <u>Patel v. Searles</u>, No. 00-9552, 2002 WL 31160034 (2nd Cir. Sept. 30, 2002).  Without deciding whether this right was in fact violated, I find no precedent for Monroe's assertion that such an infringement would render his confession involuntary.  The right to intimate association developed in <u>Roberts</u> and <u>Patel</u> is generally brought as a claim under 42 U.S.C.A. § 1983 (2002).  Monroe has cited no cases, nor have I found any, which indicate that it should be a factor in evaluating the voluntariness of his confession.

Therefore, my inquiry focuses on the final three interrogation sessions, which occurred on August 28, 29, and 31, of 1994. The August 28th session began at Monroe's home in North Carolina at approximately 9:00 a.m. and lasted a little over three hours. Monroe was not read his <u>Miranda</u> rights at this time, but there was also no evidence that he was in custody. Indeed, the police admitted that they would have had to leave the house if Monroe had refused to talk with them. <u>See</u> Tr. from Suppression Hr'g, Vol. III, at 514. The New Hampshire Supreme Court also noted that this interview "maintained a conversational tone." <u>Monroe</u>, 142 N.H. at 862. The August 29th interview at the North Carolina State Bureau of Investigation began at approximately 4:30 p.m, at which point Monroe was given <u>Miranda</u> warnings. <u>Id.</u> at 862-863. He was interrogated by only one investigator at a time, with Rose assisting in the questioning at times, and he began to confess by 10:30 p.m. <u>Id.</u> at 863.

In cases where the Supreme Court has found confessions to be coerced it has usually relied heavily upon factors which were not present in Monroe's case, i.e., a defendant's inability to understand the process, isolation from those who would provide support, and interrogation for long periods of time without

respite. See Mincey v. Arizona, 437 U.S. 385 (1978)(police interrogated defendant while he was in the hospital, seriously injured and in great pain); Blackburn v. Alabama, 361 U.S. 199 (1960)(insane defendant interrogated for eight to nine hours in small room filled with police with no break and no contact with his family or his attorney); Spano, 360 U.S. 315 (emotionally unstable defendant questioned for nearly eight straight hours by numerous officers, requests to contact attorney denied, and confession obtained at 3:30 a.m. after a friend extracted sympathy from defendant by lying); Watts v. Indiana, 338 U.S. 49 (1949)(defendant held for six days and interrogated from evening to early morning by relays of officers and not taken before magistrate nor advised of his constitutional rights); Ashcraft v. Tennessee, 322 U.S. 143 (1944)(defendant interrogated for 36 straight hours without sleep or rest and not permitted to contact anyone).

Likewise, the evidence in Monroe's case does not meet the standard set by the First Circuit, which has upheld confessions in cases involving stronger police tactics. See Johnson v. Hall, 605 F.2d 577 (1st Cir. 1979)(lengthy interrogation process with numerous police officers and incriminating line-ups); see also

-18-

<u>United States v. Kiendra</u>, 663 F.2d 349 (1st Cir. 1981)(defendant on month-long hunger strike in solitary confinement). Although Monroe challenges techniques used in the interrogation such as "raised voices," "feigned sympathy" and the role played by Rose, he fails to demonstrate that the "totality of the circumstances" rose to the level of impermissible coercion. Monroe was capable of understanding both the interrogation process and the <u>Miranda</u> warnings, and, in fact, was familiar with them as a result of the earlier interrogation sessions. He was not denied contact with his wife or others, was given sufficient breaks to eat and drink, and the state court found that the questioning was "not particularly intimidating." <u>Monroe</u>, 142 N.H. at 866.

Given the relevant Supreme Court and First Circuit precedent, the New Hampshire Supreme Court was not unreasonable in concluding that the circumstances surrounding the interrogation, including the roles played by Nick and Rose, did not render Monroe's confession involuntary.

B. **Miranda Warnings**

Monroe argues that his confession was made without an adequate waiver of his <u>Miranda</u> rights, since he did not receive a separate set of warnings prior to the post-polygraph

interrogation.[4]  The Supreme Court has held that "the prosecution may not use statements...stemming from custodial interrogation of the defendant" unless it shows that the defendant was advised of his or her constitutional rights and "voluntarily, knowingly and intelligently" waived them.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).

In answering the threshold question of whether a defendant was in custody for purposes of Miranda, the First Circuit examines "whether there was a manifestation of a significant deprivation of or restraint on the suspect's freedom of movement."  United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991).  The state trial court found that Monroe was not in custody until after Detective Seusing took over the

---

[4] Monroe also argues that the Miranda warnings which he did receive were undermined by language in the written waiver stating that if he exercised his right to remain silent, the police could "conclude that [he had] refused to cooperate...and failed to demonstrate [his] truthfulness."  Pl.'s Pet. for Writ of Habeas Corpus (Doc. No. 1), Ex. G, Polygraph Advice of Rights dated Aug. 29, 1994 ("Polygraph Waiver").  However, the waiver also clearly outlined Monroe's Miranda rights and his right to stop the polygraph or interrogation at any time and Agent Johnson carefully reviewed each paragraph of the waiver with Monroe. Monroe, 142 N.H. at 867.  Accordingly, I agree with the New Hampshire Supreme Court's conclusion that Monroe was "adequately warned" of his Miranda rights at the time that he signed the waiver.  Id. at 868.

interrogation. Suppression Order at 26. Monroe does not challenge this finding. Thus, for purposes of analysis, I assume that this finding was correct. Therefore, the question before me is whether the Miranda warnings given to Monroe prior to the polygraph test were adequate to cover the post-polygraph interrogation.

The Supreme Court has refused to adopt a *per se* rule that police must re-advise a defendant of his or her Miranda rights prior to any post-polygraph interrogation, noting instead that the "totality of the circumstances" must be considered. See Wyrick v. Fields, 459 U.S. 42, 47-49 (1982). In Wyrick the Court found that a valid waiver of the defendant's Miranda rights would extend to post-polygraph interrogation unless there was such a "significant change in the character of the interrogation" that the defendant's waiver was no longer voluntary, knowing and intelligent. Id. at 47.

In determining whether a pre-polygraph waiver is valid for post-polygraph interrogation, the Supreme Court considers whether the defendant should have anticipated the post-polygraph questioning when he or she agreed to the polygraph. See Id. The First Circuit weighs this factor along with others such as "[1]

-21-

who requested the polygraph examination; [2] who initiated the post-polygraph questioning; [3] whether the signed waiver clearly specifies that it applies to post-polygraph questioning or only to the polygraph test; and [4] whether the defendant has consulted with counsel." United States v. Leon-Delfis, 203 F.3d 103, 111-112 (1st Cir. 2000) (waiver of Sixth Amendment right to counsel).

The New Hampshire Supreme Court in this case considered the "totality of the circumstances" and held that the Miranda waiver signed by Monroe before the polygraph test was sufficient to waive his rights during the post-polygraph interrogation. Monroe, 142 N.H. at 868. It found that Monroe "should have anticipated that he would receive post-examination interrogation," citing to Wyrick and referencing both Monroe's prior experience with post-polygraph questioning and his familiarity with Detective Seusing. Id. at 869. This holding was not "contrary to" or an "unreasonable application" of Supreme Court precedent. Crucial to my determination is the fact that the waiver which Monroe signed prior to taking the polygraph test expressly contemplated the possibility of polygraph questioning, stating: "I agree to answer truthfully all questions asked (a)

during the interviews conducted before *and after* the time I am attached to the polygraph and (b) during the time I am attached to the polygraph."  Polygraph Waiver (emphasis added).[5]  This language satisfies the First Circuit's requirement that a defendant knowingly and intelligently waive his or her Miranda rights specifically for post-polygraph questioning.  See Leon-Delfis, 203 F.3d at 112 (finding that waivers which applied to pre-test and test questioning did not extend to post-test questioning since "waivers of rights are specific").  Monroe should have fully anticipated the scope of the interrogation on August 29, 1994, given the wording of this waiver and his prior experience with post-polygraph questioning by Detective Seusing on March 22, 1993.

---

[5]  Monroe claims that he should have received fresh Miranda warnings when Detective Seusing took over the interrogation because the written waiver only covered questioning by the North Carolina Bureau of Investigation, not the Nashua Police. However, the New Hampshire Supreme Court found that Monroe waived this argument by failing to preserve it in his notice of appeal. Monroe, 142 N.H. at 867 (citing N.H. Sup. Ct. R. 16(3)(b)(2002)). Since Monroe has procedurally defaulted on this argument I may only review it if he demonstrates "cause" for the default and "prejudice" resulting therefrom or shows that a "fundamental miscarriage of justice" will result from my failure to address his claim.  See Edwards v. Carpenter, 529 U.S. 446, 451 (2000). He has failed to demonstrate this in his motion, therefore I do not consider his argument in my analysis.

Monroe argues that the replacement of Agent Johnson with Detective Seusing and Rose constituted a "significant change in the character of the interrogation," thereby demanding repetition of his Miranda warnings. See Wyrick, 459 U.S. at 47. The First Circuit has not decided whether a change in interrogators necessarily requires a fresh Miranda waiver. Other circuits find it to be relevant but not dispositive and also weigh factors such as the defendant's prior experience with interrogation, continuity of the subject matter discussed and the time lapse between the waiver and the confession. See Jarrell v. Balkcom, 735 F.2d 1242, 1254 (11th Cir. 1984); United States v. Hopkins, 433 F.2d 1041, 1045 (5th Cir. 1970). See also United States v. Gillyard, 726 F.2d 1426, 1429 (9th Cir. 1984)(relying also on lack of clear indication in defendant's Miranda warnings that he would be subjected to post-polygraph interrogation). Monroe's waiver specifically included post-polygraph interrogation, he had experienced a similar waiver and interrogation with Detective Seusing in the past, and Detective Seusing's questions concerned the same material as Agent Johnson. Accordingly, the replacement of Agent Johnson with Detective Seusing did not require the issuance of fresh Miranda warnings.

Three of the factors applied by the First Circuit in <u>Leon-Delfis</u> do weigh in Monroe's favor: i.e., Monroe took the polygraph test at the request of his wife and the police, he did not initiate the post-polygraph questioning, and he did not consult with counsel at the time of the interrogation. However, the pre-polygraph waiver clearly informed Monroe that he had the right to request counsel and to stop the polygraph or interviews at any time, yet he did neither. <u>Monroe</u>, 142 N.H. at 869. Viewed in light of the "totality of the circumstances," it was not unreasonable for the New Hampshire Supreme Court to conclude that the waiver signed by Monroe prior to the polygraph provided adequate protection for him during the post-polygraph interview.

## IV. <u>CONCLUSION</u>

Given the limited standard of review which I must apply under § 2254(d)(1), I find that the state court's decision was not "contrary to" or an "unreasonable application" of Supreme Court precedent. Accordingly, I grant the Warden's motion for summary judgment (Doc. No. 8) and deny Monroe's motion for summary judgment (Doc. No. 10).

-25-

SO ORDERED.


_____
Paul Barbadoro
Chief Judge

November 22, 2002

cc:  Philip T. McLaughlin, Esq.
     Nicholas Court, Esq.
     Andrew R. Schulman, Esq.